[No. C012772. Third Dist. Dec. 8, 1993.]

DAVID J. TIRAPELLE, as Director, etc., Plaintiff and Respondent, v.
GRAY DAVIS, as Controller, etc., Defendant and Appellant;
CALIFORNIA STATE EMPLOYEES ASSOCIATION et al., Interveners
and Appellants.

## COUNSEL

D. Robert Shuman, Richard J. Chivaro and James R. Tucker for Defendant and Appellant.

Gary P. Reynolds, Howard Schwartz, Darrell S. Steinberg, Harry J. Gibbons, Carroll, Burdick & McDonough, Ronald Yank, Gary M. Messing, Richard M. Pattison, Dennis F. Moss, Joel H. Levinson, Suzanne L. Branine, Beeson, Tayer & Bodine and John Provost for Interveners and Appellants.

Christopher W. Waddell, K. William Curtis and Roy J. Chastain for Plaintiff and Respondent.

## OPINION

**SPARKS, Acting P. J.**—In this appeal we consider the authority of the State Controller (Controller) to refuse to implement salary reductions established in 1991 by the Department of Personnel Administration for certain employees of the state who are not entitled to engage in collective bargaining under the Ralph C. Dills Act.[1] (Gov. Code, § 3512 et seq., especially § 3524 [unless otherwise specified further section references are to the Government Code].) We hold that the Controller may not refuse to implement the salary reductions in dispute.

### I

At the outset of the 1991-1992 fiscal year, the State of California faced what has been called an unprecedented budgetary crisis. The crisis was precipitated by a significant projected revenue to expenditure shortfall. (See *Department of Personnel Administration* v. *Superior Court* (1992) 5 Cal.App.4th 155, 163 [6 Cal.Rptr.2d 714].) Except in certain narrowly defined circumstances, our state Constitution forbids the state from engaging in deficit spending. (Cal. Const., art. XVI, § 1;[2] see § 13337.5.)

In the Budget Act of 1991, the Legislature and the Governor attempted to deal with the shortfall in a number of ways. One of those ways is found in

---

[1] Plaintiff David J. Tirapelle is the Director of the Department of Personnel Administration. Tirapelle appears in this proceeding solely in his official capacity. For purposes of clarity and convenience we will use the designation DPA or the Department in referring to the official actions and/or positions taken by the plaintiff.

[2] The Legislature may create debts or liabilities which, singly or in the aggregate with any previous debts or liabilities, do not exceed $300,000. (*Ibid.*) The Legislature may create debts or liabilities in the case of war to repel invasion or suppress insurrection. (*Ibid.*) And the Legislature may authorize the creation of debts or liabilities for some single object or work, provided the law specifies the ways and means for payment of the principal and interest on the debt, the measure is passed by a two-thirds vote of all of the members elected to each house of the Legislature, and the measure is approved by the electorate at a general election or direct primary. (*Ibid.*) Obviously, these exceptions to the general rule against deficit spending could be of little assistance in resolving a large general revenue shortfall.

section 3.90 of the act, which provides: "Notwithstanding any other provision of this act, each item of appropriation in this act shall be reduced, as appropriate, to reflect a $351,000,000 reduction in General Fund employee compensation items. [¶] The Director of Finance shall allocate the necessary reductions to each item of appropriation to accomplish the reductions required by this section. [¶] This section shall not apply to appropriations made by Items 0110-001-001 [appropriations to the Senate], 0120-011-001 [appropriations to the Assembly], and 0160-001-001 [appropriations to the Legislative Counsel Bureau] of Section 2.00 of this act." (Stats. 1991, ch. 118, § 3.90.)[3] The Governor also reduced the funds provided by the Legislature for employee compensation and benefit increases, gave his reasons for the reductions, and then approved the Budget Act of 1991 on July 16, 1991. (Stats. 1991, ch. 118, Governor's objections to Budget Act of 1991.)

In our governmental scheme of things, the Department of Finance has general powers of supervision over all matters concerning the financial and business policies of the state. (§ 13070.) Every state agency or court for which an appropriation has been made must submit to the Department of Finance a complete and detailed budget setting forth all proposed expenditures and estimated revenues for the ensuing fiscal year.[4] (§ 13320.) In the budget submitted to the Department of Finance, each agency must estimate and call attention to the sums necessary for employee compensation, including merit salary adjustments. (§ 19835.5.) Until enactment of the budget act containing appropriations for the fiscal year, the Department of Finance may revise, alter or amend the budget of any state agency. (§ 13322.) The Department of Finance then assists the Governor in preparing the budget

---

[3]Section 3.90 of the Budget Act of 1991 was in addition to other provisions affecting the sums available for employee compensation. In Statutes 1990, chapter 458, the Legislature provided for so-called "trigger reductions" to be imposed on general fund appropriations when certain specified conditions are found to exist. (See § 13308; Welf. & Inst. Code, §§ 11453.05, 12201.05, 12303.51, 14029, 16702.01.) Trigger reductions were applicable in the 1991-1992 fiscal year, and the Budget Act of 1991 includes trigger reductions for various budgeted items before application of section 3.90, as well as reductions to General Fund appropriations for merit salary adjustments. (Stats. 1991, ch. 118, § 1.20.)

[4]The separation of powers doctrine provides some limitation upon the extent to which an administrative agency may be granted powers of supervision over the courts. (Cal. Const., art. III, § 3; *Millholen* v. *Riley* (1930) 211 Cal. 29, 34 [293 P. 69].) However, we are here concerned only with the state's relationship with executive employees by virtue of actions taken by the DPA. The DPA is not vested with authority with respect to the salaries of judicial employees. (§§ 19815, 19825, subd. (b); former § 19815.1.) Although the courts were not exempted from the budgetary response to the 1991-1992 fiscal crisis, DPA did not purport to include judicial employees within its orders. In order to provide appropriate focus upon the issues presented and to avoid needless entanglement with irrelevant questions, we will hereafter delete references to the courts in discussing the jurisdiction and functions of various agencies. In adopting this narrative device we do not intend to suggest any views about judicial employees.

which the state Constitution requires the Governor to submit to the Legislature. (§ 13337.)

The power of appropriation resides exclusively in the Legislature. (*California State Employees' Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 107-108 [108 Cal.Rptr. 60].)[5] In the budget act the Legislature provides appropriations for the support of various state agencies during the ensuing fiscal year. Upon the request of an agency during the fiscal year, the Department of Finance may authorize transfers between its budget allotments, including reserves. (§ 13323.) However, "[n]o appropriation may be combined or used in any manner to avoid budgeting the salary or operating expenses of any position or to achieve any purpose which has been denied by any formal action of the Legislature." (§ 13332.15.) No one may incur any expenditure in excess of the allotments or other provisions of the fiscal year budget as approved by or changed by or with the approval of the Department of Finance, and any person doing so is liable both personally and on his or her official bond for the amount of the excess expenditure. (§ 13324.)

The Department of Finance exercises general supervisorial powers over the state's fiscal affairs, which include control and enforcement of the budgets of various state agencies. (§§ 13070, 13320, 13323, 13337; *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 459 [343 P.2d 8].) However, the Department of Finance is not given plenary authority over all state activities. Section 3.90 of the Budget Act of 1991 required the Director of Finance to allocate reductions in the appropriations for employee compensation in each item of the budget in order to provide for overall reductions in employee compensation in the amount of $351 million. An agency's allotments for employee compensation, after allocation of reductions by the Director of Finance as provided in section 3.90, provided the maximum amount that the agency could incur for employee compensation during the fiscal year. (§ 13324; *Vandegrift* v. *Riley* (1934) 220 Cal. 340, 355 [30 P.2d

---

[5]The Governor participates to an extent in the appropriation process. The Governor submits a proposed budget to the Legislature and a budget bill is prepared in a manner that follows the format of the Governor's budget. (§§ 13337-13338.) Upon the passage of the budget bill, or of any bill containing an appropriation, the Governor has the power to veto the bill or to reduce or eliminate one or more items of appropriation while approving other portions of the bill. (Cal. Const., art. IV, § 10, subds. (a) & (e).) While this participation in the budgetary process is significant, the Governor lacks complete control over state appropriations in two respects. First, items of appropriation rejected by the Governor may be separately reconsidered and passed over the Governor's veto by a two-thirds majority of the membership of each house of the Legislature. (*Ibid.*) Second, the Governor's power is limited to reduction or elimination of items of appropriation passed by the Legislature; the Governor has no power to appropriate money or to spend funds which the Legislature has not appropriated. (Cal. Const., art. XVI, § 7.)

516]; see Cal. Const., art. XVI, § 7.) Thereafter the role of the Department of Finance was one of supervision and enforcement of the budget; the Department of Finance was not delegated the responsibility for achieving the reduced spending necessitated by the budget reductions.[6]

The task of determining how to achieve budget reductions in employee compensation items fell largely to the DPA. The Legislature created the DPA in 1981 for the purpose of managing the nonmerit aspects of the state's personnel system. (§ 19815.2, Stats. 1981, ch. 230, § 55, p. 1169.) The DPA succeeded to certain powers and duties formerly exercised by the State Personnel Board, the State Board of Control, the Department of General Services, and the Department of Finance. (§ 19816.)[7] In general, the DPA has jurisdiction over the state's financial relationship with its employees, including matters of salary, layoffs and nondisciplinary demotions. (§§ 19816, 19816.2, 19825, 19826.)[8] For purposes of collective bargaining the director of the DPA was designated as the Governor's representative to

---

[6]In the factual scenario which gave rise to this litigation the Department of Finance was aligned with the DPA. Immediately after the enactment of the Budget Act of 1991, the Director of Finance notified all departments and agencies of the need to finalize plans for implementing the reductions in the budget. He advised that in order to make the compensation reduction allocations required by section 3.90 of the budget act, he had accounted for anticipated savings from collective bargaining and had then applied a 5 percent reduction to all departments except those involved in 24-hour care, law enforcement, and revenue production, which received 2 percent reductions. In support of the DPA's petition for a writ of mandate, the Chief Deputy Director of the Department of Finance submitted a declaration in which he explained that the budget reductions in the Budget Act of 1991 required the state to make significant reductions in its existing payroll levels. Although there were some measures which would help, such as normal attrition and a hiring freeze, those steps would not eliminate the problem and unless the state could reduce salaries and wages it would be compelled to lay off significant numbers of employees. Although the Department of Finance agreed with the DPA's attempt to reduce compensation and minimize the need for layoffs, it properly deferred to the DPA for accomplishment of that policy.

[7]Section 19816 provides: "Except as provided by Section 19816.2, the department succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the State Personnel Board with respect to the administration of salaries, hours and other personnel related matters, training, performance evaluations, and layoffs and grievances. [¶] The department succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the State Board of Control and the Department of General Services with respect to the administration of miscellaneous employee entitlements. [¶] The department succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the Department of Finance with respect to the administration of salaries of employees exempt from civil service and within range salary adjustments."

[8]The DPA, unlike the State Personnel Board, is not a constitutional agency. Our state Constitution provides that except as exempted by the Constitution, every officer and employee of the state is within the civil service and "[i]n the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Cal. Const., art. VII, § 1.) The Constitution creates the State Personnel Board and vests it with jurisdiction over the merit aspects of the civil service. (Cal. Const., art. VII, §§ 2, 3.) Under prior law the Legislature delegated to the State Personnel Board

meet and confer with recognized employee organizations under the Ralph C. Dills Act. (§§ 3517, 19815.4, subd. (g).)

A difficult employee compensation situation confronted state agencies, particularly the DPA, in the 1991-1992 fiscal year. In addition to trigger reductions, other reductions imposed by the Legislature, and the Governor's "blue pencil" reductions, the Legislature ordered that all allotments for employee compensation (except those applicable to the Senate, Assembly and Legislative Counsel Bureau) be allocated a share of an aggregate $351 million reduction. In prior years employee compensation budgetary concerns revolved around whether, and if so to what extent, appropriations would be made available for compensation increases. In making appropriations for compensation increases the Legislature would often direct the manner in which the appropriations should be distributed. (See, e.g., Stats. 1943, ch. 62, § 2, item 228, p. 297 [$25 increase for employees earning less than $300 per month, $20 increase for employees earning more than $300 per month]; Stats. 1963, Second Ex. Sess. of 1962, ch. 1, § 2, item 282, pp. 485-486 [6 percent salary increase for employees earning up to $19,800 per year]; Stats. 1969, ch. 355, § 2, item 297.1, pp. 784-785 [salary increase for employees earning less than $950 per month and who were 7 percent or more below the prevailing rate]; Stats. 1976, ch. 341, § 15, p. 938 [$120 increase for the California Highway Patrol, $70 per month increase for other employees].) In other instances the Legislature itself allocated or directed the allocation of appropriations for compensation increases to particular budget items. (See Stats. 1969, ch. 1479, § 1, p. 3030 [$3.6 million to increase salaries of psychiatric technicians]; Stats. 1970, ch. 1614, § 1, p. 3390 [$4.1 million to increase salaries of the California Highway Patrol]; Stats. 1972, ch. 512, § 1, p. 891 [$5 million to increase salaries of the Department of Corrections and the California Youth Authority].) In the Budget Act of 1991, the Legislature imposed reductions in agency budget allotments available for employee

certain powers and duties over nonmerit aspects of the state personnel system, including salary setting functions. (See *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 189, 193 [172 Cal.Rptr. 487, 624 P.2d 1215].) The nonmerit aspects of the state's personnel system are now vested in the DPA, but the DPA may not exercise its powers in a manner that interferes with the constitutionally imposed merit principle of civil service. (*Ibid.*) The Legislature has recognized this limitation and has provided that certain actions of the DPA are subject to review by the State Personnel Board for consistency with merit employment principles. (§§ 19816.2, 19826, subd. (a), 19997.) Additional limitations upon the DPA stem from its status as a statutorily created administrative agency. The matter of setting employee compensation is a legislative function which, in this instance, the Legislature has delegated to the DPA. (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 189.) The DPA can act only to the extent and in a manner consistent with the legislative delegation of authority. And the DPA's exercise of this authority is quasi-legislative (see *Lowe* v. *California Resources Agency* (1991) 1 Cal.App.4th 1140, 1151-1152 [2 Cal.Rptr.2d 558]), and is thus subject to the ultimate authority of the Legislature to reject or alter such exercise of authority through appropriate legislation.

compensation but did not provide directions as to how those reductions should be accomplished.

Although the Legislature chose not to provide explicit directions for accomplishing employee compensation reductions, there are a number of restrictions which are implicit in the Budget Act of 1991. First, an agency's allotment for employee compensation, as determined after allocation of its share of the reduction required by section 3.90 of the Budget Act of 1991, is the maximum sum the agency can incur for employee compensation during the fiscal year. (§ 13324.) Second, the Legislature obviously did not intend for agencies to continue operations without regard to their reduced allotments for employee compensation and thus risk being required to close down before the end of the fiscal year for lack of funds to compensate employees. Third, the Legislature specifically directed that specified reductions be applied to employee compensation allotments and consequently agencies were not free to disregard this direction and use funds allotted for other purposes to compensate employees. (§§ 13332.15, 13323, 13324.)[9]

There are limited means by which employee compensation can be reduced so as to stay within employee compensation budget allotments. The available means fall into the broad categories of reducing the size of the work force, reducing the compensation payable on a per-employee basis, or some combination thereof. The DPA asserts that the employee compensation allotment reductions of the Budget Act of 1991 raised the specter of significant employee layoffs. It therefore determined to attempt to reduce salaries in order to minimize the need for layoffs. The salary reduction target chosen by the DPA was 5 percent per employee.

This court has previously considered certain aspects of the DPA's efforts to reduce employee compensation items during the 1991-1992 fiscal year. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th 155.) That case involved rank and file employees who were represented for purposes of collective bargaining under the Ralph C. Dills Act. The DPA, as the Governor's designated representative, and various employee unions had negotiated and participated in mediation but had reached impasse. (*Id.* at p. 163.) The DPA purported to impose its "last, best offer" upon the employees, which included 5 percent salary reductions. (*Id.*

---

[9]On a case-by-case basis the Department of Finance may authorize transfers between budget allotments of an agency that requests such transfers, so long as the transfers are not done to accomplish a purpose which has been denied by formal action of the Legislature. (§§ 13323, 13332.15.) We need not here consider whether the legislative directive in section 3.90 of the Budget Act of 1991 would preclude application of section 13323 in specific situations, since it is clear that there is no provision of law which would permit executive agencies to engage in wholesale disregard of their employee compensation allotments.

at p. 164.) The employee unions successfully petitioned the superior court for extraordinary relief precluding implementation of the DPA directive. (*Id.* at p. 162.) The DPA then petitioned this court for a writ of mandate compelling the superior court to set aside its judgment. (*Ibid.*)

In considering the issues presented this court noted that the Ralph C. Dills Act is a "suppression statute"; that is, the parties are permitted to override otherwise applicable statutory provisions in a memorandum of understanding (MOU), but in the absence of an existing MOU, those statutory provisions apply. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th at pp. 174-175.) The DPA's salary setting function, set forth in section 19826, is one of the statutory provisions which may be overridden in a MOU. (§ 19826, subd. (d).) However, with respect to represented employees under the Ralph C. Dills Act, section 19826, subdivision (b), specifically provides that the DPA "shall not establish, adjust, or recommend a salary range." Since the parties' MOU had expired and they were at an impasse, section 19826 was applicable, but that section prohibited the DPA from imposing salary reductions.[10] Accordingly, the DPA had no authority to impose salary reductions upon represented employees at impasse during collective bargaining. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th at pp. 174-175.)[11]

This case involves a different aspect of the DPA's efforts to reduce employee compensation. We are here concerned with managerial and supervisory employees in civil service and certain exempt employees. Managerial and supervisory employees and civil service exempt positions are excluded from the provisions of the Ralph C. Dills Act. (§ 3513, subd. (c).) With respect to civil service exempt positions section 19825, subdivision (a), provides: "Notwithstanding any other provision of law, whenever any state

---

[10]This does not mean that represented employees had a vested right to existing salary levels. Salary setting is a legislative function and since the Legislature chose not to delegate this function to DPA with respect to represented employees under the Ralph C. Dills Act, it necessarily retained that role for itself. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th at p. 178.)

[11]The result was otherwise with respect to the DPA's decision to reduce health benefit contributions. Although section 22825.1 provided a formula for the determination of employer contributions, section 22825.15, subdivision (b), provided that, notwithstanding section 22825.1, employer contributions for represented employees should be determined through the collective bargaining process. Part of the collective bargaining process is the rule that an employer can impose its "last, best offer" if the parties have negotiated in good faith, participated in mediation, but are still at impasse. Since, unlike the matter of salaries and wages, the applicable statutory provisions did not prohibit the DPA from setting employer contributions for health benefits but instead referred that matter to the collective bargaining process, the DPA had the authority to impose its last, best offer with respect to health benefit contributions. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th at pp. 187-188.)

agency is authorized by special or general statute to fix the salary or compensation of an employee or officer, which salary is payable in whole or in part out of state funds, the salary is subject only to the approval of the department before it becomes effective and payable, except as provided in subdivision (b). The Legislature may expressly provide that approval of the department is not required."[12] With respect to civil service employees who are excluded from the Ralph C. Dills Act, section 19826, subdivision (a), provides: "The department shall establish and adjust salary ranges for each class of position in the state civil service subject to any merit limits contained in Article VII of the California Constitution. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The department shall make no adjustments which require expenditures in excess of existing appropriations which may be used for salary increase purposes. The department may make a change in salary range retroactive to the date of application for such change."[13]

On July 1, 1991, the DPA announced an immediate general salary decrease for classes designated managerial and "E99." With a few exceptions to which lesser decreases applied, salaries were reduced by 5 percent. In August 1991, the DPA announced 5 percent salary decreases for supervisorial employees effective with the September 1991 paychecks.

The Controller initially implemented the managerial employee compensation reductions. However, in September 1991, he announced that he would not implement the supervisory employee compensation reductions, would

---

[12]Subdivision (b) refers to employees of the judicial branch, whose compensation is subject to the approval of the Chairperson of the Judicial Council.

[13]The rule prohibiting expenditures in excess of available appropriations is fundamental and the Legislature has incorporated it into numerous statutory provisions concerning state employee compensation. (See, e.g., §§ 9610, 19834, 19835.) The rule is of constitutional origin. (Cal. Const., art. XVI, § 7.) Pursuant to the rule any judgment by which a class of employees obtains relief compelling the Department to consider or reconsider their salary range should be made subject to the availability of appropriations to pay any resulting increases. (*State Trial Attorneys' Assn.* v. *State of California* (1976) 63 Cal.App.3d 298, 305 [133 Cal.Rptr. 712]; *Conference of Referees* v. *State Personnel Board* (1968) 262 Cal.App.2d 131, 141, fn. 11 [68 Cal.Rptr. 563].) For this purpose "appropriations" may be distinguished from "allotments." Typically in the budget act the Legislature appropriates sums for the support of an agency but does not provide a complete breakdown of how the funds will be spent. The breakdown is provided in the agency's budget allotments, which are under the supervision of the Department of Finance. Except where it would violate a directive of the Legislature, the Department of Finance may authorize transfers between an agency's budget allotments without violating the appropriation rule. (See *Vandegrift* v. *Riley, supra*, 220 Cal. at pp. 349-354.)

cease implementing the managerial compensation reductions, and would repay managerial employees for sums which had previously been withheld. The DPA petitioned for a writ of mandate compelling the Controller to implement its salary reduction decisions. A number of employee organizations intervened.[14] The trial court granted the relief sought by the DPA. The Controller and interveners appeal and we shall affirm.

## II

The Controller is a state constitutional officer who is elected at the same time and places and for the same term as the Governor. (Cal. Const., art. V, § 11.) The Constitution provides: "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." (Cal. Const., art. XVI, § 7.) With respect to the Controller, as with other officers, the Constitution follows a minimalist approach, that is, it provides for the office but primarily leaves it to the Legislature to define the duties and functions of the Controller. (See *Pierce* v. *Superior Court* (1934) 1 Cal.2d 759, 761-762 [37 P.2d 460, 96 A.L.R. 1020]; *Millholen* v. *Riley*, *supra*, 211 Cal. at p. 34; *People* v. *Brophy* (1942) 49 Cal.App.2d 15, 29 [120 P.2d 946]; *People* v. *Nye* (1908) 9 Cal.App. 148, 159-160 [98 P. 241].) The Legislature has wide discretion in defining the duties and functions of the office. (*Love* v. *Baehr* (1874) 47 Cal. 364, 368; *Ross* v. *Whitman* (1856) 6 Cal. 361, 364-365.)[15]

We turn now to the statutes governing the Controller's fiscal duties. Section 12410 provides in relevant part: "The Controller shall superintend

[14]While managerial and supervisory employees are excluded from collective bargaining under the Ralph C. Dills Act, the Bill of Rights for State Excluded Employees (§ 3525 et seq.) permits excluded employees to form employee organizations which may represent them in their employment relations, including grievances, with the state (§ 3530). The Bill of Rights goes further with respect to supervisory employees by providing that, upon request, the state must meet and confer with supervisory employee organizations, meaning that the employer must "consider as fully as the employer deems reasonable such presentations as are made by the verified supervisory employee organization on behalf of its supervisory members prior to arriving at a determination of policy or course of action." (§ 3533.) In light of these provisions it was appropriate for employee organizations to intervene on behalf of their members in this litigation.

[15]The Controller has numerous duties and responsibilities imposed upon him by statute and to some extent by the Constitution. For example, under the Constitution he is a member of the Board of Equalization (Cal. Const., art. XIII, § 17), and has certain duties with respect to the transfer and allocation of general revenues to the State School Fund (Cal. Const., art. XVI, §§ 8, 8.5). By statute the Controller is defined as a civil executive officer. (§ 1001.) For certain purposes the Office of State Controller is deemed to be a state department with the Controller as head of the department. (§ 12405.) The Controller is a member of the State Board of Control. (§ 13901.) And the Legislature has by statute delegated responsibilities to the Controller in matters of the internal working of state government as well as with respect to the state's relationships with the federal and local governments. (§ 12410 et seq.) Here, we will focus upon the Controller's duties as they may relate to the compensation of state

the fiscal concerns of the state. The Controller shall audit all claims against the state, and may audit the disbursement of any state money, for correctness, legality, and for sufficient provisions of law for payment. . . ." Section 12440 provides: "The Controller shall draw warrants on the Treasurer for the payment of money directed by law to be paid out of the State Treasury; but a warrant shall not be drawn unless authorized by law, and unless . . . unexhausted specific appropriations provided by law are available to meet it." Claims against the state for which appropriations have been made or for which state funds are available may be presented to the Controller pursuant to rules adopted by the Board of Control for the presentation and audit of claims. (§§ 925.4, 13920, subd. (c); Cal. Code Regs., tit. 2, §§ 620-625.) The Controller may not draw a warrant for any claim until it has been audited unless such claim is specifically exempted by law from a Controller's audit. (§ 925.6.) Upon completion of an audit the Controller may approve the claim and draw a warrant for its payment,[16] or disapprove the claim and file it and a statement of his disapproval and his reasons with the Board of Control. (§§ 925.8, 926.) A person aggrieved by the Controller's disapproval of a claim may appeal to the Board of Control and upon a sufficient showing the board may order the Controller to reconsider his rejection of the claim. (§§ 926.2, 926.4.) If the Controller rejects the claim again the claimant may appeal the matter to the Legislature. (§ 926.6.)[17]

The Controller's role in auditing and paying claims has been the subject of much litigation in the past. The decisional authorities reflect the Controller's basic duty to audit claims "for correctness, legality, and for sufficient provisions of law for payment." (§ 12410.) Depending upon the particular circumstances involved, the Controller's function may fall into a category described as ministerial or may involve discretionary or factfinding powers.

---

employees and will not attempt to set forth a complete description of the Controller's role in state government.

[16]The Controller draws his warrant upon the fund out of which the claim is payable and such fund must be designated on the warrant. (§ 17000.) The Controller may not draw a warrant for salaries upon an exhausted fund. (*Cullinan* v. *Superior Court* (1938) 24 Cal.App.2d 468, 473 [75 P.2d 518].) Where a fund has been exhausted then a claim may be satisfied only by securing, where permitted by law and with the approval of the Department of Finance, a transfer of moneys into the fund (§ 13323), or by presenting the claim to the Legislature (*Raymond* v. *Christian* (1937) 24 Cal.App.2d 92, 111-113 [74 P.2d 536]).

[17]All other claims for money or damages must be presented to the Board of Control, including claims for which an appropriation has been made or for which a state fund is available but which have been rejected by the Controller, claims for which the appropriation or fund designated is exhausted, claims for which no appropriation has been made or for which no fund is available but the settlement of which has been provided for by statute or constitutional provision, claims on an express contract, claims for inverse condemnation, claims based on negligence or on an unsafe condition of public property, and claims based on any other injury for which the state is liable. (§ 905.2; see Cal. Code Regs., tit. 2, §§ 630-632.11.)

The distinction is important for if, under the circumstances, the Controller's duty is ministerial it may be directed by writ of mandate while otherwise it may not. (*Millholen* v. *Riley, supra,* 211 Cal. at p. 35; *Sullivan* v. *Gage* (1905) 145 Cal. 759, 766 [79 P. 537]; *Madden* v. *Riley* (1942) 53 Cal.App.2d 814, 821 [128 P.2d 602]; *U'ren* v. *State Board of Control* (1916) ·31 Cal.App. 6, 12 [159 P. 615].)[18]

The Controller's discretionary or factfinding powers generally involve the determination of the factual circumstances necessary to establish the validity of particular claims. For example, in *Madden* v. *Riley, supra,* 53 Cal.App.2d 814, a provision of the old Political Code provided for reimbursement for out-of-state travel expenses incurred by an employee on state business with the prior approval of the Governor and Director of Finance. When the Controller refused to honor the plaintiff's claim for reimbursement, the plaintiff asserted that the prior approval of the Governor and Director of Finance was conclusive upon the Controller. The Court of Appeal disagreed and held that the Controller was entitled to audit the claim, noting that the claim might be improper for a variety of circumstances such as "that the services for which it was previously approved were not actually performed, or that the convention was held for a purpose entirely different from that which was represented by the claimant. Under such circumstance, it is the duty of the Controller to reject the claim." (*Id.* at p. 820.)[19]

The Controller's authority is generally said to be ministerial when the amount of an expenditure is set by law or entrusted to the discretion of another agency or branch of government. For example, in *Millholen* v. *Riley, supra,* 211 Cal. 29, a secretary of the Court of Appeal sought mandate to compel the Controller to issue a warrant in payment of her salary. The Supreme Court issued a writ of mandate for the relief sought, reasoning that ". . . it was the intention of the legislature to leave both the appointment and the compensation of law secretaries to the courts they serve. Of course, respondents have the power of audit of petitioner's claim, but this is far from being authorized to appoint her or to fix her compensation." (*Id.* at p. 35.) At the time of *U'ren* v. *State Board of Control, supra,* 31 Cal.App. 6, the audit function now performed by the Controller was committed to the Board of

---

[18]The Controller's rejection of a claim in the exercise of discretionary or factfinding powers is not necessarily conclusive against the claimant. Depending upon the circumstances the claimant may have judicial remedies, although not in mandate (*Madden* v. *Riley, supra,* 53 Cal.App.2d at p. 821), or the claimant may have the right to appeal to the Board of Control and ultimately to the Legislature (§§ 926.2, 926.6).

[19]Although the court in *Madden* endorsed the Controller's duty to inquire into the factual validity of the claim, it rejected his legal conclusion that the convention attended by the plaintiff was not state business for which reimbursement could be claimed and held that the allegations of the petition for relief through mandate were sufficient. (*Id.* at pp. 821-824.)

Control, which was a successor to the Board of Examiners. In discussing precedent the court noted "that as to that class of claims against the state treasury of which the power of creation and propriety as to amount were matters intrusted to the discretion of other departments of the state government, the functions of the state board of examiners were merely those of an auditing body, with power to pass upon the regularity in form of the claim, but with no discretion nor control over the amount for which the claim should be allowed." (*Id.* at p. 11; see also *Lewis* v. *Colgan* (1897) 115 Cal. 529, 532 [47 P. 357]; *Bateman* v. *Colgan* (1896) 111 Cal. 580, 582-583 [44 P. 238]; *People* v. *Whitman* (1856) 6 Cal. 659, 660; *Fowler* v. *Peirce* (1852) 2 Cal. 165, 167.)

Although in some circumstances the Controller may have discretionary duties, ". . . the greater part of the duties devolved upon him by the law are of a ministerial character. . . . His duties are enumerated and defined by the law, and they are, as we have said, generally of a purely ministerial character. He has no discretion as to the issuance of warrants for appropriations for the public service. He cannot refuse his warrants for the salaries of the Governor and Judges, upon any notions that such matters rest in his discretion, and that in his judgment those officers have not performed their duties. He cannot undertake to say that in his judgment the capitol ought not to be erected at Sacramento, and therefore, in the exercise of his discretion, refuse the warrants for the appropriation made by the law. But if he cannot do this in the cases supposed, he cannot do it in any case where a specific ministerial duty is enjoined." (*McCauley* v. *Brooks* (1860) 16 Cal. 11, 55.)

The factual basis of the legal dispute in *McCauley* v. *Brooks*, *supra*, is not important here. Upon consideration of the dispute the Supreme Court determined that mandate should issue to compel the Controller to draw a warrant in favor of the claimants. On petition for rehearing the Controller claimed an independent right which could not be controlled by mandate to determine the propriety of expenditures. The court issued a lengthy opinion denying the petition for rehearing in order to reject arguments of the Controller that the court regarded as "preposterous" and "pernicious." (16 Cal. at pp. 57, 64.) In its discussion the court pointed out that if the Controller is vested with such independent authority then so also must be other officers such as the Treasurer, Secretary of State and the Governor. (*Id.* at pp. 60-61.).[20] There would be nothing that would preclude the Treasurer from insisting upon the

[20]Some years later, in *Lukens* v. *Nye* (1909) 156 Cal. 498 [105 P. 593], the court considered an attempt by the Governor to exercise authority over the sums that should be paid for a claim against the state. There, the Legislature passed a bill appropriating a certain sum in payment of a claim and before approving the bill the Governor advised the claimants that he believed the claim to be excessive and he extracted an agreement to accept less than the full amount of the appropriation. (*Id.* at p. 500.) The court held that the agreement was void. In his role as

right to independently review and refuse to honor the warrants of the Controller, or that would preclude the Secretary of State from refusing to perform the duties of that office, such as certifying appointments and/or elections. (16 Cal. at pp. 60-61.) "We have supposed, for the purpose of illustrating the practical effect of the doctrine asserted by the respondent, that the exemption from legal control in matters ministerial, is limited to those who are specially termed State officers, though we have shown that immunities, if existing, as to them, must extend in like manner to all the officers of the executive department. This being the case, the administration of the government would for all useful purposes be dissolved. All officers of that department, upon that doctrine, would be and are independent, not only of all process of the Courts, but of each other; or rather, the action of each is dependent for its efficacy upon the view which the others may take of their own duties. If this doctrine can be maintained, the government must cease to be one of law, and must sink into merited contempt for its weakness and inefficiency." (*Id.* at p. 61.)

Although the Controller has frequently been involved in litigation over the payment of claims against the state, this case is somewhat unusual. Generally, the reported cases involve actions by a claimant to compel the Controller to issue warrants in payment of claims which have been rejected. In contrast, this case involves an announced intent of the Controller to issue warrants for the payment of sums in excess of the amounts approved by the state agency with primary jurisdiction over the subject matter of the claims. Nevertheless, we have no doubt that in an appropriate case extraordinary relief may be granted to prohibit the Controller from drawing warrants in payment of claims in excess of the sums provided for by law. (See *Ireland* v. *Riley* (1935) 11 Cal.App.2d 70, 78 [52 P.2d 1021].)[21]

---

part of the legislative process the Governor could veto the appropriation, but he had no power as an executive officer to reject or interfere with the measure once it became law. (*Id.* at p. 504.) Among other things, the court said: "The fiscal officers of the state would not be justified in relying on the sanction of the law for the disbursement of state funds; they would be forced to inquire of the governor and of the beneficiaries to learn whether or not an agreement had been made modifying such laws, or creating an estoppel against the enforcement thereof. In case of disputes, difference, or doubts concerning the terms or execution of such agreements, the officers would have to decide as to the truth of the matter. It is impossible to overestimate the scandals that might arise under such a system, if it were authorized. . . ." (*Id.* at pp. 504-505.)

[21]In *Ireland* v. *Riley, supra*, the Court of Appeal held that the Controller should be enjoined from drawing a warrant in payment of the price of liquor license stamps ordered by the Board of Equalization. There, the board had ordered the stamps notwithstanding the Department of Finance's disapproval of its proposed contract. (11 Cal.App.2d at p. 71.) Since the validity of the contract was dependent upon approval of the Department of Finance, the court concluded that there was no legal authority for payment of the price of the stamps and that the Controller should be enjoined from drawing a warrant in payment of the price of the stamps. (*Id.* at p.

While the Controller disagrees with the DPA's decision to reduce salary levels, he does not point to any provision of law which would authorize payment of salaries at the prior higher levels pending resolution of disputes over the reductions. The Controller may not draw a warrant upon the Treasury except as directed by law. (§ 12440; *Ingram* v. *Colgan* (1895) 106 Cal. 113, 128 [39 P. 437]; *Madden* v. *Riley, supra,* 53 Cal.App.2d at p. 820; *Brandt* v. *Riley* (1934) 139 Cal.App. 250, 257 [33 P.2d 845].) With respect to the compensation of state employees the Legislature has not seen fit to delegate to the Controller any supervisory or review powers over the decisions of the DPA. (§§ 19825, 19826.) The Controller has the power to audit salary claims, but this is far from being authorized to fix compensation. (*Millholen* v. *Riley, supra,* 211 Cal. at p. 35.) Although disputes over salary levels inevitably arise (see *California State Police Assn.* v. *State of California* (1981) 120 Cal.App.3d 674 [175 Cal.Rptr. 34]; *State Trial Attorneys' Assn.* v. *State of California, supra,* 63 Cal.App.3d 298; *Conference of Referees* v. *State Personnel Board, supra,* 262 Cal.App.2d 131), the Legislature has not provided that the decisions of the DPA should be held in abeyance nor has it authorized the Controller to fix salary levels pending resolution of such disputes.[22]

In a contention we will examine shortly, the Controller contends that the DPA did not act in accordance with section 19826. He argues that the DPA is statutorily required to carefully examine and give due weight to the prevailing rates, but instead gave only cursory review to the limited raw data. Apparently, the Controller harbors the misapprehension that upon his disagreement with the salary reduction decisions of the DPA he has the authority to draw warrants for the payment of salaries at the higher preexisting levels. The Controller's audit powers are not so broad. It is well established that public employees have no vested rights to particular levels

78.) From the reported decision it does not appear whether the Controller had announced an intention to draw a warrant in payment of the price of the stamps and he may have been a nominal party in the dispute between the Department of Finance and the Board of Equalization. Nevertheless, the decision does support the conclusion that the Controller may be judicially prohibited from drawing an unauthorized warrant. (See §§ 925.6, 12440.)

[22]The situation is different with respect to rank-and-file employees represented for purposes of collective bargaining under the Ralph C. Mills Act. Principles of collective bargaining require that upon expiration of an MOU the employer must maintain the status quo until a new bargain is reached or negotiations reach an impasse. (*Department of Personnel Administration* v. *Superior Court, supra,* 5 Cal.App.4th at p. 188.) Upon impasse the employer may take unilateral action with respect to compensation and other matters. (*Ibid.*) However, with respect to represented employees, the Legislature has reserved the power to set salaries to itself rather than delegate such power to the DPA. (*Id.* at pp. 174-175.) Accordingly, until the Legislature acts salary levels for represented employees must be maintained at existing levels. (*Ibid.*) There is no similar provision which would require maintenance of the status quo pending resolution of disputes over the DPA's exercise of its salary setting authority with respect to employees excluded from the Ralph C. Dills Act.

of compensation and salaries may be modified or reduced by the proper statutory authority. (*Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 150 [82 P.2d 434, 126 A.L.R. 838]; *Gilmore* v. *Personnel Board* (1958) 161 Cal.App.2d 439, 449 [326 P.2d 874].) It is also well recognized "that compensation for official services depends entirely upon the law; that statutes relating to such compensation are strictly construed in favor of the government; [and] that a public officer may only collect and retain such compensation as is specifically provided by law . . . ." (*County of San Diego* v. *Milotz* (1956) 46 Cal.2d 761, 767 [300 P.2d 1]; see also *Van Riessen* v. *City of Santa Monica* (1976) 63 Cal.App.3d 193, 199-200 [133 Cal.Rptr. 618].) The Legislature has not provided for abeyance of the DPA's decisions nor granted the Controller authority to disregard such decisions pending resolution of disputes, and we may not imply such authority from the power to audit claims. (*Millholen* v. *Riley, supra*, 211 Cal. at p. 35; *U'ren* v. *State Board of Control, supra*, 31 Cal.App. at p. 11.)

Since the Controller has not been given powers of supervision over the DPA nor the power to review its decisions, the extent of his authority to disregard orders of the DPA in the performance of his audit function is limited by fundamental principles of jurisdiction. Jurisdictional concepts are most fully developed in the judicial sphere. There, a distinction is recognized between acts by a tribunal that lacks jurisdiction over the subject matter and acts within the tribunal's fundamental jurisdiction that are merely erroneous, although often referred to as acts in excess of jurisdiction. (*Moffat* v. *Moffat* (1980) 27 Cal.3d 645, 655-656 [165 Cal.Rptr. 877, 612 P.2d 967]; *Armstong* v. *Armstrong* (1976) 15 Cal.3d 942, 951 [126 Cal.Rptr. 805, 544 P.2d 941]; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 122 [101 Cal.Rptr. 745, 496 P.2d 817].) Erroneous decisions by a tribunal with fundamental jurisdiction over the issue must be challenged in the normal course of judicial review; such decisions may not be collaterally attacked and may not be ignored. (*Ibid.*) In this context a violation of statutory provisions or procedural rules which are "mandatory" may render a decision erroneous and subject to reversal on direct judicial review, but will not deprive the tribunal of fundamental jurisdiction. (*In re Marriage of Harris* (1977) 74 Cal.App.3d 98, 102 [141 Cal.Rptr. 333]; *Neil D. Reid, Inc.* v. *Department of Health Care Services* (1976) 55 Cal.App.3d 418, 421 [127 Cal.Rptr. 685]; *Liberty Mut. Ins. Co.* v. *Ind. Acc. Com.* (1964) 231 Cal.App.2d 501, 509 [42 Cal.Rptr. 58].)

This distinction has been recognized with respect to administrative agencies. An administrative agency's quasi-legislative acts within its jurisdiction are entitled to considerable judicial deference (*Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683-685 [129 Cal.Rptr. 97, 547 P.2d 1377]), but

will be judicially reviewed to determine whether the agency has proceeded as required by law and whether its decision is arbitrary and capricious (*Delta Rent-A-Car Systems, Inc.* v. *City of Beverly Hills* (1969) 1 Cal.App.3d 781, 785 [82 Cal.Rptr. 318]). However, an agency may act only within the scope of authority conferred upon it. When an agency transgresses the scope of its authority the purported action is void regardless whether it is otherwise reasonable. (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 391 [211 Cal.Rptr. 758, 696 P.2d 150].)

This concept has also been applied to executive officers. In *Middleton* v. *Low* (1866) 30 Cal. 596, the petitioner sought mandate to compel the Governor to execute a patent for a tract of land. The law provided for proceedings before various state officers for the purpose of effectuating a purchase of lands from the state. Upon certification of compliance from the Register of the State Land Office, the Governor was required to execute a patent. In that case the petitioner had taken the steps necessary to effectuate a purchase of land from the state and the Register of the State Land Office had presented his certificate to the Governor, however, the Governor refused to execute a patent for sale of the lands to the petitioner.

In *Middleton*, the Governor argued that his official acts were not subject to control by writ of mandate. The court rejected that claim, saying: "[t]he signing of a patent for land, which is required by law to be executed by an officer, to give effect to a sale made by other officers of the Government, and as a means of passing the title of the Government to the purchaser, is purely a ministerial act. . . ." (30 Cal. at p. 601.) Thus ". . . the duty is imperative upon the officer charged with the execution of the patent to execute it, unless the law vested him with discretionary powers in that respect. The same rule would apply to the Governor as to an inferior or subordinate officer. . . ." (*Ibid.*) Nevertheless, the court determined that mandate would be denied because the state lacked jurisdiction over the subject matter of the sale since the title to the land in question had not been transferred to the state by the federal government. The court said: "This is not a case in which it can be said that the Governor refuses to execute the patent, in the exercise of his discretion, as might be said if the refusal was based upon his opinion of the propriety of selling the land, or of the regularity of the several acts required to be performed before the patent is to be signed, or upon similar grounds; but the refusal rests upon the ground that it is his duty to refuse to execute a patent for lands not owned by the State, notwithstanding the Register's certificate." (*Id.* at p. 608. See also *People* v. *Brophy, supra,* 49 Cal.App.2d at pp. 28-30 [Attorney General had no authority to invade the affairs of other governmental agencies and his attempt to do so was void.].)

That the Controller has the power, indeed the duty, to ensure that the decisions of an agency that affect expenditures are within the fundamental jurisdiction of the agency is clear. First, while under traditional definitions the power of audit is ministerial in the sense that it does not embrace the power to review or reject the decisions of an agency vested with discretion over the expenditure, the power of audit does include the duty to ensure that the expenditure in question is authorized by law. (See *Millholen* v. *Riley*, *supra*, 211 Cal. at p. 35; *U'ren* v. *State Board of Control*, *supra*, 31 Cal.App. at pp. 11-12.) Second, with respect to the Controller's duties the Legislature has specifically provided that "a warrant shall not be drawn unless authorized by law . . . ." (§ 12440.) An attempt by an administrative agency to exercise control over matters which the Legislature has not seen fit to delegate to it is not authorized by law and in such case the agency's actions can have no force or effect.

■ From these authorities we conclude that the Controller's duty to audit claims against the Treasury includes the duty to ensure that expenditures are authorized by law, but does not include the power to review and approve or reject decisions of a department vested by the Legislature with authority over expenditures.[23] Where a department or agency acts within the authority delegated to it by the Legislature, the Controller must defer to the agency or department and leave review of the decision to the courts and/or the Legislature. With this understanding of the Controller's function we may proceed, in the next portion of this opinion, to consideration of the specific assertions of the Controller and the interveners.

### III

■ The primary assertion advanced by the Controller and the interveners is the claim that the DPA failed to give appropriate consideration to prevailing pay rates. Section 19826, subdivision (a), which we have quoted in full above, requires that in establishing or changing salary ranges the DPA must give consideration to prevailing rates for comparable service in other public employment and private business. This provision requires the DPA to weigh, but not rigidly adhere to, nonstate rates of compensation. (*California State Police Assn.* v. *State of California*, *supra*, 120 Cal.App.3d at p. 679; *State*

---

[23]The authority to review decisions of the executive is inherently judicial and the Legislature may not delegate the complete power of review to an executive officer. (*Dept. of Public Works* v. *Superior Court* (1925) 197 Cal. 215, 221 [239 P. 1076].) However, we have no doubt that if the Legislature chose to do so it could make the decisions of the DPA subject to the approval of the Controller, or it could invest the Controller with quasi-judicial powers of review, subject to final review in the courts. (*East Bay M. U. Dist.* v. *Dept. of P. Wks.* (1934) 1 Cal.2d 476, 478-479 [35 P.2d 1027]; *Gaylord* v. *City of Pasadena* (1917) 175 Cal. 433, 436-437 [166 P. 348].) The Legislature has not chosen to do so.

*Trial Attorneys' Assn.* v. *State of California, supra,* 63 Cal.App.3d at pp. 303-304.)[24]

In this mandate proceeding, the DPA submitted declarations asserting that consideration had been given to prevailing rates. The Controller and intervenors responded that the DPA failed to satisfy its burden of showing that it gave appropriate consideration to prevailing rates because it relied upon data that was considered in connection with January 1, 1991, salary increases and which was thus stale; the data concerned rank and file pay rates rather than supervisor and manager salaries; the data was in raw form without statistical analysis; and the consideration given to the data was perfunctory.

As we have noted in a prior portion of this opinion, the Controller had no authority to call the DPA before him to justify its exercise of the authority delegated to it by the Legislature. The DPA thus had no burden to carry. This objection of the Controller to the DPA salary decisions clearly goes to the Controller's disagreement with the manner in which the DPA exercised its authority and does not implicate the DPA's fundamental authority to make salary decisions. Accordingly, this objection furnishes no basis for the Controller to refuse to implement the salary setting determinations of the DPA.

The Controller asserts that the DPA took its salary reduction actions out of a general concern for the state's fiscal condition and that the state's fiscal condition is a matter for the Legislature rather than the DPA to resolve.[25] This also is an objection to the manner in which the DPA exercised its authority and does not implicate the DPA's fundamental authority to act. It does not support the Controller's action.

---

[24]The prevailing rate guideline is subject to, and may be entirely overridden by, the appropriation process. (*California State Employees' Assn.* v. *State of California, supra,* 32 Cal.3d at p. 108; see also *California State Employees' Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219, 240 [108 Cal.Rptr. 251].) The Legislature has provided that the fixing or authorizing of the fixing of a salary by statute does not constitute an appropriation for payment of the salary and the salary may be paid only if moneys are made available for that purpose by another provision of law. (§ 9610.) It has also provided that an agency or department may not use its appropriations in a manner to avoid budgeting for employee compensation and may not incur expenditures in excess of its allotments for compensation purposes. (§§ 13324, 13332.15.) If the Budget Act of 1991, or any other act of the Legislature, required the DPA to reduce salary levels then it would be required to do so regardless of prevailing rates. However, while the Budget Act of 1991 imposed reductions on total employee compensation allotments, it did not specify how the reductions were to be accomplished and did not specifically require salary reductions. Accordingly, the DPA was required to consider prevailing rates in implementing the Budget Act of 1991.

[25]In 1945, when public employee salaries were determined by the State Personnel Board, former section 18850, the predecessor to section 19826, included the state's financial condition in the list of factors to be considered in setting salaries. (Stats. 1945, ch. 123, § 1, pp. 549-550; Stats. 1945, ch. 1279, § 1, p. 2406.) That factor was deleted from former section

The Controller asserts that the DPA's action was arbitrary and capricious. Obviously, such an objection reflects disagreement with the DPA's decision rather than a challenge to the DPA's authority over the subject matter.

The Controller further asserts that even if the DPA had authority over civil service employees it had no authority to reduce the salaries of exempt employees. Although exempt positions are not subject to civil service laws, they are nevertheless governed by laws otherwise applicable to state employment. We are concerned here with employees of the executive branch of government.[26] Accordingly, we will focus upon laws applicable to executive employees in addressing this contention.

In view of the size and complexity of state government, it has long been necessary that the business of the state be entrusted to departments, boards, commissions and agents. (*Ray* v. *Parker* (1940) 15 Cal.2d 275, 291 [101 P.2d 665].) The Legislature has declared: "It is the policy of this State to vest in the Governor the civil administration of the laws of the State and for the purpose of aiding the Governor in the execution and administration of the laws to divide the executive and administrative work into departments as provided by law." (§ 11150.) So far as consistent with law, and subject to the approval of the Governor, the head of each department has authority over the operations of the department including the power to appoint officers and employees, prescribe their duties, and fix their compensation. (§§ 11152, 11154.)

Within this scheme of things the Legislature has created departments which are vested with authority and supervision over some aspects of the operations of other departments. Two such instances we have previously noted are the Department of Finance, which is vested with general powers of supervision over the financial and business policies of the state, and the DPA, which is vested with managing the nonmerit aspects of the state's personnel system. (§§ 13070, 19815.2.) The DPA, which is a relatively recent legislative creation, succeeded to powers and duties formerly exer-

---

18850 in 1949. (Stats. 1949, ch. 252, § 1, pp. 474-475.) We may assume for purposes of argument that a general concern over the state's financial condition is not an appropriate factor for the DPA to consider but such an assumption does not advance the position of the Controller or the interveners. Here, the DPA was concerned with specific legislative reductions of the allotments and appropriations available for employee compensation and that is a matter that the DPA certainly must consider.

[26]Employees of the judicial branch are not within the jurisdiction of the DPA. (§§ 19815, subd. (d), 19825, subd. (b).) Legislative employees, except employees of the Legislative Counsel Bureau, are also not within the jurisdiction of the DPA. (§ 19815, subd., (d).) Although employees of the Legislative Counsel Bureau are generally within the jurisdiction of the DPA, the Legislative Counsel Bureau, together with the Senate and Assembly, was specifically excepted from the employee compensation reductions imposed in section 3.90 of the Budget Act of 1991.

cised by the State Personnel Board, the State Board of Control, the Department of General Services, and the Department of Finance. (§ 19816.)

The DPA's approval authority over the salaries of civil service exempt employees is set forth in section 19825, subdivision (a), which provides that such salaries are subject only to the approval of the DPA before they become effective and payable. In general the power of approval over expenditures implies an exercise of some degree of discretion and thus confers greater authority than the ministerial power of audit. (*Cosner* v. *Colusa County* (1881) 58 Cal. 274, 277-278; *1st Fed. etc. Assn.* v. *St. Bd. of Control* (1942) 53 Cal.App.2d 391, 396-398 [128 P.2d 75].) Nevertheless, we agree that the mere power of approval over compensation, standing alone, is not itself sufficient authorization to reduce salaries when the power to fix those salaries is exclusively conferred upon a different agency. The power of approval must be coupled with some other supervisory control over the salaries or employees in question in order to authorize a reduction or change in salary by the approving agency. Whether and to what extent the power of approval has been conjoined with other supervisory authority depends upon the statutes in question. Consequently, the precise limits of a statutory power of approval can only be determined by reference to the entire statutory scheme of which the power is a part. In some cases the supervisory authority may be so substantial that the power of approval over salaries necessarily includes the discretion to reduce or change the salaries. In other cases the authority conferred by a power of approval may be so minimal as to be virtually ministerial in character. (*Ibid.*)

Before the creation of the DPA, the authority to approve compensation of civil service exempt employees was exercised by the Department of Finance. (Former § 18004, added by Stats. 1945, ch. 123, § 1, p. 535; former Pol. Code, § 675.1, added by Stats. 1935, ch. 68, § 1, p. 404; former Pol. Code, § 675b, added by Stats. 1931, ch. 325, § 7, p. 847.) The extent of the authority previously exercised by the Department of Finance was examined in *State* v. *Brotherhood of R. R. Trainmen* (1951) 37 Cal.2d 412 [232 P.2d 857]. There, the state brought a declaratory relief action seeking to invalidate a contract entered into between the labor brotherhoods and the Board of State Harbor Commissioners. The challenged contract fixed the rates of pay and working conditions of employees of a state owned and operated railroad and the state sought to invalidate it on the grounds that pay and working conditions for civil service employees were governed exclusively by legislative or administrative rules and not by a collective bargaining agreement. Under the statutory scheme then in existence, compensation was fixed by commissioners within ranges set by the State Personnel Board, subject to the approval of the Department of Finance. The contract in question fixed pay

and set working conditions but was never approved by the Department of Finance. Former section 18004, the immediate predecessor to section 19825, provided in relevant part that whenever a state agency fixes the salary or compensation of an employee which salary is payable out of state funds, ". . . the salary is subject to the approval of the Department of Finance before it becomes effective and payable." The brotherhoods asserted that to accept the requirement of approval of salaries by the Department of Finance would be tantamount to transferring to that department the power to "fix" compensation, which properly resided in the employer. In rejecting this assertion, the court considered the power of approval of compensation as an adjunct of the Department of Finance's power of supervision over the financial and business policies of the state under section 13070. "There is no inconsistency between section 18004 and the provision in section 1705 of the Harbors and Navigation Code authorizing the Board of State Harbor Commissioners to fix the salary of its employees. The Department of Finance is given general powers of supervision over all matters concerning the financial and business policies of the state. (Gov. Code, § 13070, based on former Pol. Code, § 654.) The purpose of such legislation is to conserve the financial interests of the state, to prevent improvidence, and to control the expenditure of state money by any of the several departments of the state. . . . Since sections 18004 and 1705 may be harmonized, they should be construed together and with reference to the whole system of which they form a part. . . . Moreover, even if we were to accept the argument that the requirement of approval of salaries by the Department of Finance is tantamount to transferring to the department the power to 'fix' compensation of Harbor Board employees, the legislative intent to create supervisory powers in the department is so clear and unmistakable that section 18004 must be regarded as modifying all earlier legislation authorizing specific state agencies to fix the salaries of their employees." (37 Cal.2d at pp. 421-422, some citations and fn. omitted; see also *Treu* v. *Kirkwood* (1954) 42 Cal.2d 602, 609 [268 P.2d 482]; *Ireland* v. *Riley*, *supra*, 11 Cal.App.2d at p. 72.)

The power of approval and the administration of salaries of exempt employees has now been transferred to the DPA (§§ 19816, 19825, subd. (a)), while the general residual power of supervision over financial and business policies remains with the Department of Finance (§ 13070). This represents a splitting of the functions which were construed together in the prior decisions we have cited. Nevertheless, we still must conclude that the power of approval of the DPA, coupled with its administration of the salaries of exempt employees, confers some degree of discretion over their salaries. It was established that the Department of Finance, through its power of approval and supervisory powers, retained discretion over salaries of exempt employees. In transferring those powers to the DPA the Legislature broadly

provided: "The department succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the Department of Finance with respect to the administration of salaries of employees exempt from civil service and within range salary adjustments." (§ 19816.) In this transfer of authority we discern no legislative intent to reduce the discretionary authority exercised by the Department of Finance to a mere ministerial authority in the DPA.[27] Accordingly, we conclude that the power of approval, coupled with the transferred authority over the administration of salaries, vests the DPA with discretion over the salaries of civil service exempt employees which the Controller is not free to disregard.

The Controller retorts that the power of approval implies that the DPA can act only if the appointing power initiates the action and otherwise the DPA has no authority. The Controller asserts that when he called upon the DPA to justify its actions, the DPA did not provide evidence that any appointing power requested salary reductions, and that he was thus entitled to disregard the DPA directives.

The precise limits of the DPA's discretion, and the manner in which it must be exercised, cannot be determined in the abstract without reference to a specific department or agency or, in fact, to a specific employment position. The grant of discretionary authority to the DPA is general in nature and it can certainly be limited or circumscribed in its exercise by specific provisions of law applicable to an employing power.[28] Accordingly, the nature of the DPA's approval authority is not necessarily uniform throughout

---

[27]While we conclude that the transfer of authority from the Department of Finance to the DPA carried with it some of the discretion formerly exercised by the Department of Finance, we do not suggest that the DPA now exercises all of the authority formerly exercised by the Department of Finance. The Department of Finance retains the general power of supervision over all matters concerning the financial and business policies of the state and this includes enforcement and control of the budgets of the various agencies of the state. (§§ 13070, 13320, 13323, 13337.) This would create an interesting and perhaps difficult legal question in the event the Department of Finance disputed the propriety and necessity for the DPA's salary actions. However, as we have previously noted (*ante*, p. 1322, fn. 6), in this case the Department of Finance is aligned with and supportive of the DPA and we have no occasion to consider the extent to which the Department of Finance's general powers of supervision may be a constraint upon the discretion of the DPA.

[28]That the extent of discretion conferred by a power of approval requires reference to the supervisory authority of both the person or entity with the power and the person or entity whose action is subject to approval may be illustrated by reference to two decisions of the Courts of Appeal. In *Brown v. Cranston* (1963) 214 Cal.App.2d 660 [29 Cal.Rptr. 725], a statutory scheme provided for the compensation of inheritance tax appraisers in an amount to be fixed by the court but further provided that no claim should be paid unless first approved by the Controller. Upon review of the entire statutory scheme the Court of Appeal rejected the contention that the Controller was without discretion to limit the amount of compensation inheritance tax appraisers received and that his function was merely ministerial. (*Id.* at pp. 670-673.) "We believe that the provision that no payment shall be made unless the claim is

the state, but may vary in accordance with the amount of supervisory authority granted or denied to specific departments and agencies.[29]

We are not concerned here with specific claims. The Controller has announced a blanket refusal to adhere to DPA salary decisions and in support of his refusal has offered only a general assertion of the lack of authority. He has not suggested that any specific employer has submitted a payroll claim asking that employees be compensated at rates higher than those approved by DPA directives or that any employer has asked him to disregard the DPA's salary decisions. He has not pointed to any specific agency nor cited any specific legal authorities which would indicate that the DPA's discretion is circumscribed with respect to any particular claim.

In view of this litigation posture it is unnecessary, and indeed unwarranted, for us to attempt to determine whether with respect to any particular department, agency, or employee, the DPA has exceeded its authority. In general, the DPA has discretionary authority over the salaries of civil service exempt employees and the Controller is not free to engage in a blanket, across-the-board refusal to follow DPA decisions. On that basis we will uphold the judgment of the trial court. It bears emphasis that we reach this conclusion on the narrow basis necessary to resolve the limited question presented and imply no view with respect to any underlying controversy between the DPA, any department or agency, and any employee or group of employees. Our decision is without prejudice to the right of the Controller, in the exercise of his statutory duties as explained herein, to determine whether the DPA lacked fundamental authority with respect to any specific salary claim. And, of course, our decision is without prejudice to the right of

first approved by the controller means substantially more than a mere requirement that the claim be audited to assure compliance with legal procedures. As we have seen, the controller is charged with the duty of supervising the administration of the inheritance tax laws. He is in a position to and does supervise the appraisers in their activities. . . ." (*Id.* at p. 670.) In contrast, in *Estate of Majtan* (1965) 237 Cal.App.2d 7 [46 Cal.Rptr. 561], a statutory scheme provided that with the approval of the court the administrator of an estate could compromise a claim against the estate. The Court of Appeal noted that the statutory scheme indicated an intent to place primary discretion in the administrator of the estate and that it provided a procedure for obtaining the court's approval which could be initiated by the administrator alone. The court concluded that the power of approval vested in the court did not include the power to compel the administrator to settle a claim at the behest of a creditor. (*Id.* at pp. 19-20.)

[29]In section 19825, subdivision (a), the Legislature has set forth two circumstances in which the DPA has no authority over salaries of exempt employees, these being where the employee is not paid in whole or in part out of state funds and where with respect to a specific position or agency the Legislature has declared that DPA approval is not required. In other circumstances the DPA has discretionary authority to some extent, but the extent of the authority can only be determined by reference to the specific authority conferred by law upon the department or agency employer.

any department, agency, employee or group of employees to seek resolution of specific disputes in any appropriate forum.

The intervener California State Employees Association asserts that the power to establish and adjust salary ranges granted to the DPA by section 19826, subdivision (a), does not include the authority to adjust salaries within the ranges thus set. According to this argument, a reduction of the salary range for a particular class can only affect the salaries of current employees earning more than the new maximum salary. All other employees would be entitled to be maintained at their prior salary levels because those levels would be within the new range established by the DPA.

By long-standing practice, salary levels for state employees have been set as a range, defined by the minimum and maximum for the class, with intermediate steps between the extremes. (See *Proctor* v. *S. F. Port Authority* (1968) 266 Cal.App.2d 675, 679-681 [72 Cal.Rptr. 248].) Generally, an employee enters employment at the minimum salary for his or her class and is entitled to annual adjustments to the next higher step within the class until he or she reaches the maximum salary for that class. (*Ibid.*) This practice has legislative sanction. Section 19829, subdivision (a), requires the DPA to provide for intermediate steps within the minimum and maximum limits of a salary range. Section 19832, subdivision (a), entitles an employee to an annual m*erit* salary adjustment equal to one intermediate step so long as the employee meets standards of efficiency set by the DPA.[30] The DPA has implemented this compensation plan through duly adopted rules. (Cal. Code Regs., tit. 2, § 599.665 et seq.) The DPA rules provide for automatic adjustment of steps, and the salaries of incumbents within the steps, whenever the maximum and minimum salaries of the class are changed. (Cal. Code Regs., tit. 2, § 599.689.)[31]

---

[30]In particular circumstances the DPA has the authority to alter the general application of these provisions. For example, the DPA may authorize payment at any step above the minimum in order to meet recruiting problems, to obtain a person of extraordinary qualifications, to correct salary inequities resulting from actions of the DPA or State Personnel Board, or to give credit for prior state service. (§ 19836, subd. (a).) Other salary adjustments within a salary range may be made upon application of the appointing power and with the approval of the director of the DPA. (*Ibid.*)

[31]Title 2, California Code of Regulations, section 599.689, provides: "Unless otherwise provided by the Department of Personnel Administration, whenever the salary range for a class is changed, the salary of each incumbent in the class on the date the range change was made effective shall be adjusted by the total of the range differentials between the maximum salary rates and shall retain the same salary adjustment anniversary date. When range changes are made effective retroactively, incumbents in the class between the effective date of the range change and the date of Department of Personnel Administration action, inclusive, shall also receive the same adjustment. [¶] When salary range changes become effective the same date as an employee's salary adjustment date, the employee shall first receive any salary

Here the DPA reduced salary ranges, defined as the maximum and minimum salaries for each affected class, and adjusted the steps within the ranges by an equal proportion. This is consistent with statutory directive, administrative rules, and long-standing practice. It was not beyond the DPA's fundamental authority and does not support the Controller's refusal to follow the DPA's decision.

■ The intervener California Department of Forestry Employees Association asserts that constitutional due process principles entitled employees to a predeprivation adjudicatory hearing before salary reduction actions were taken. (See *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774]; *Ng* v. *State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606 [137 Cal.Rptr. 387].) We disagree. We have previously noted that the salary levels of state employees are not contractual or otherwise vested. (*County of San Diego* v. *Milotz, supra,* 46 Cal.2d at p. 767; *Boren* v. *State Personnel Board, supra,* 37 Cal.2d at p. 641.) The due process right to a predeprivation hearing is applicable only to matters which are the subject of a legitimate claim of entitlement and does not apply to a mere expectancy or hope of future benefits. (*Paramount Convalescent Center, Inc.* v. *Department of Health Care Services* (1975) 15 Cal.3d 489, 494-495 [125 Cal.Rptr. 265, 542 P.2d 1].) Moreover, the matter of setting and adjusting salary ranges is quasi-legislative. (*Lowe* v. *California Resources Agency, supra,* 1 Cal.App.4th at pp. 1151-1152.) Due process principles do not require that quasi-legislative actions be preceded by a trial-type adjudicatory hearing. (*Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823]; *California Optometric Assn.* v. *Lackner* (1976) 60 Cal.App.3d 500, 505 [131 Cal.Rptr. 744].)[32]

There is ample authority that would support providing employees with a quasi-legislative hearing with respect to salary range changes. Section

adjustment to which entitled and then receive the range differential adjustment. [¶] When salary range changes become effective the same date as an employee's promotion, the salary adjustments shall be made in such order that the employee shall gain the maximum benefit from the adjustments."

[32]The intervener relies upon *Professional Engineers in Cal. Government* v. *State Personnel Bd.* (1980) 114 Cal.App.3d 101 [170 Cal.Rptr. 547]. There, the employee association had secured a writ of mandate requiring the board to conduct a trial-type adjudicatory hearing with respect to prevailing wages and the judgment was affirmed in an unpublished opinion. When the trial court determined that the board had not obeyed the original writ, it issued a supplemental writ to compel compliance. On appeal from the judgment issuing the supplemental writ, the board argued that a quasi-judicial hearing was not required but the Court of Appeal refused to permit the board to relitigate questions which had been adversely determined against it in the prior proceeding. (*Id.* at pp. 107-108.) That holding is an application of the jurisdiction rule we have previously cited, namely that a decision of a tribunal with fundamental jurisdiction may not be ignored and may not be collaterally attacked even if it is asserted to be erroneous. But erroneous it was. Setting and adjusting salary ranges is manifestly legislative rather than judicial in character, there is no constitutional requirement of a hearing in a quasi-legislative proceeding, and when a hearing is statutorily required it

19828, subdivision (a), provides: "Reasonable opportunity to be heard shall be provided by the department to any employee affected by a change in the salary range for the class of his or her position." Section 19815.4, subdivision (e), provides that the director shall "Hold hearings, subpoena witnesses, administer oaths, and conduct investigations concerning all matters relating to the department's jurisdiction." The department's rules provide a grievance and appeal procedure with respect to employer-employee relations for excluded employees. (Cal. Code Regs., tit. 2, § 599.856 et seq.) And the department's rules provide for hearings in connection with appeals, wherein " '[a]ppeal' means any written request for relief filed with the Department of Personnel Administration and includes 'application,' 'petition,' and 'protest.' " (Cal. Code Regs., tit. 2, § 599.894 et seq.; see § 599.895.) In *Lowe* v. *California Resources Agency, supra,* 1 Cal.App.4th at pages 1151-1152 and 1157-1158, this court upheld a superior court order which required the DPA to accord certain employees a quasi-legislative hearing on their request for changes in their salary ranges.

In its response to the Controller's inquiries, the DPA advised that affected employees were notified of the DPA's intent to reduce salary ranges but that no employee or employee organization requested an opportunity to be heard.[33] The Controller did not purport to rely upon a requirement of a quasi-legislative hearing in refusing to follow the DPA's salary directives. Various interveners appeared in support of the Controller's refusal to follow the DPA directives, but the interveners did not request that the court require the DPA to hold quasi-legislative hearings. When the due process question was briefly raised during argument to the trial court, the DPA said that it would "give anyone who wants a hearing a hearing." However, none of the parties requested such relief. Under these circumstances, we find no basis for disturbing the trial court's decision in favor of the DPA. The limited question presented is whether the Controller can refuse to follow the salary setting decisions of DPA, and we have held that he may not so long as the DPA acts within the fundamental authority delegated to it by the Legislature. Here the DPA acted within its statutory authority and since no party requested a quasi-legislative hearing it was unnecessary for the court to consider whether such relief would otherwise be appropriate.

need not be of a formal adjudicatory nature. (*Wood* v. *Public Utilities Commission, supra,* 4 Cal.3d at pp. 292-293; *California Optometric Assn.* v. *Lackner, supra,* 60 Cal.App.3d at p. 505.) To the extent the *Professional Engineers in Cal. Government* decision suggests otherwise, we decline to follow it. (See *Lowe* v. *California Resources Agency, supra,* 1 Cal.App.4th at pp. 1151-1152.)

[33]As we have previously noted, managerial employees are entitled to be represented by employee organizations with respect to their employment relations, including grievances. (§ 3530.) Supervisory employees are entitled to be represented and upon request the DPA must meet and confer with supervisory employee organizations before arriving at a determination of policy or course of action. (§ 3533.) In its response to the Controller the DPA advised that no employee organization had requested an opportunity to be heard or to meet and confer over the salary reductions.

## DISPOSITION

The judgment is affirmed.

Sims, J., and Nicholson, J., concurred.

The petitions of interveners and appellants for review by the Supreme Court were denied March 3, 1994.