[No. C061648. Third Dist. Aug. 30, 2011.]

EDMUND G. BROWN, JR., as Governor, etc., et al., Plaintiffs and Respondents, v.
JOHN CHIANG, as State Controller, etc., Defendant and Appellant;
DEBRA BOWEN, as Secretary of State, etc., et al., Interveners and Appellants.

**COUNSEL**

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, James M. Humes, Chief Deputy Attorney General, Douglas J. Woods, Zackery P. Morazzini, Mark R. Beckington, Jonathan K. Renner and Stephen P. Acquisto, Deputy Attorneys General, for Defendant and Appellant and for Interveners and Appellants.

K. William Curtis, Warren C. Stracener, Linda A. Mayhew, Will M. Yamada; Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra, Kristianne T. Seargeant and Meredith H. Packer for Plaintiffs and Respondents.

## Opinion

**ROBIE, J.**—Prompted by California's unprecedented budget deficit, on December 19, 2008, Governor Arnold Schwarzenegger issued an executive order directing the Department of Personnel Administration (department) to implement a mandatory two-day-a-month unpaid furlough of most workers employed in the executive branch. Our Supreme Court recently held this order was valid because it was ratified by the Legislature. (*Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 [116 Cal.Rptr.3d 480, 239 P.3d 1186] (*Professional Engineers*).) However the court left open the question of whether the decision extended to employees of elected constitutional officers. (*Id.* at pp. 1005, 1034, fn. 28.) We conclude it does.

State Controller John Chiang, as well as the Lieutenant Governor, Secretary of State, Treasurer, Attorney General, Superintendent of Public Instruction, and members of the Board of Equalization (hereafter collectively the officers[1]), appeal from the judgment of the trial court granting the Governor's petition for writ of mandate compelling the Controller to exercise his ministerial duty to comply with the furlough order. In a related case brought by several employee organizations, the trial court ruled the Governor had the authority to furlough represented state employees pursuant to Government Code[2] sections 19849 and 19851 and the terms of the employees' memoranda of understanding. Arguing the Governor's furlough order did not apply to the Controller's employees, the Controller refused to implement the order as to those employees. The trial court disagreed and issued the requested writ of mandate directing compliance with the order.

On appeal, the Controller contends the trial court erred in granting the petition for writ of mandate. The Controller asserts he does not have a ministerial duty to implement the furlough order because (1) it does not apply to the officers' employees; (2) subsequent budget legislation rendered the order moot; and (3) the Governor is estopped from enforcing the order. The Controller further asserts that applying the furlough order to the officers' employees would (1) violate the state Constitution's system of divided executive authority; (2) usurp the power of the Legislature; and (3) infringe upon the officers' right to control the staffing and management of their respective offices.

---

[1] The Controller refers to the appellants as constitutional officers (Cal. Const., art. V, §§ 9, 11, 13, art. IX, § 2, art. XIII, § 17), while the Governor maintains they are civil executive officers (Gov. Code, § 1001). We shall simply refer to them as the officers.

[2] All further undesignated section references are to the Government Code unless otherwise specified.

In *Professional Engineers*, the California Supreme Court held the Governor "possessed authority to institute a mandatory furlough of represented state employees, reducing the earnings of such employees, only if specifically granted such unilateral authority in an applicable memorandum of understanding entered into between the state and the employee organization representing the affected employees," but "even if the Governor lacked authority to institute the challenged furlough plan unilaterally," the Legislature subsequently "validated the Governor's furlough program" by revising the Budget Act of 2008 to "reduc[e] the appropriations for employee compensation contained in the original 2008 Budget Act by an amount that reflected the savings the Governor sought to obtain through the two-day-a-month furlough program." (*Professional Engineers, supra*, 50 Cal.4th at p. 1000.) The court noted the present appeal, but did not address whether the Governor possesses the power to furlough the officers' employees, either unilaterally or with the Legislature's consent. (*Id.* at pp. 1005, 1034, fn. 28, 1047.)

█ For reasons we shall explain, we conclude the Governor's furlough order, which was subsequently approved by the Legislature, applied to the officers' employees, such that the Controller had a ministerial duty to implement the mandatory furlough plan as to these employees. This duty did not cease when the Governor subsequently used the line-item veto to cut the officers' respective budgets because the officers refused to implement the furloughs. Nor do principles of equitable estoppel operate to prevent the Governor from enforcing the furlough order against the officers. Finally, applying the furlough order to the officers does not violate the California Constitution's system of divided executive authority or impermissibly interfere with their statutory right to control the staffing and management of their respective offices. Accordingly, we affirm the judgment issuing a writ of mandate compelling the Controller to comply with the furlough order as to the officers' employees.

## BACKGROUND

On November 6, 2008, the Governor issued a proclamation convening the Legislature in a special session to address California's fiscal crisis and unprecedented state budget deficit. The Legislature failed to reach a resolution.

On December 1, 2008, the Governor issued a proclamation declaring a fiscal emergency. Article IV of the California Constitution provides the Governor may declare a fiscal emergency when "the Governor determines that, for that fiscal year, General Fund revenues will decline substantially below the estimate of General Fund revenues upon which the budget bill for that fiscal year, as enacted, was based, or General Fund expenditures will increase substantially above that estimate of General Fund revenues, or

both . . . ." (Cal. Const., art. IV, § 10, subd. (f).)[3] When this occurs, the Governor may call the Legislature into a special session; submit proposed legislation directly to the Legislature; and if the Legislature fails to pass and send bills to the Governor addressing the crisis, it may not act on any other bill nor adjourn for a joint recess until that bill or bills have been passed and sent to the Governor. (Cal. Const., art. IV, § 10, subd. (f).)

On December 19, 2008, the Governor issued Executive Order No. S-16-08 (the furlough order) outlining the worsening fiscal crisis and explaining that (1) there was an approximately $15 billion General Fund deficit for the 2008–2009 fiscal year, which without effective action was forecast to grow to a $42 billion General Fund budget shortfall over 18 months; (2) on November 6, 2008, the Governor issued a special session proclamation and convened the Legislature to meet in extraordinary session to address the fiscal crisis, but the Legislature failed to enact any bills to address the state's significant economic problems; (3) on December 1, 2008, the Governor declared a fiscal emergency and convened the Legislature to address the crisis; (4) on December 17, 2008, California's Pooled Money Investment Board took unprecedented action to halt lending money for an estimated 2,000 infrastructure projects as a result of the cash crisis, including the substantial risk that California would have insufficient cash to meet its obligations as of February 2009; and (5) the Legislature had failed thus far to effectively address the unprecedented statewide fiscal crisis.

Based on the foregoing, the Governor declared that (1) immediate and comprehensive action was necessary to prevent the state from missing payroll and other essential services payments; (2) current spending must be reduced to ensure the essential services of the state are not jeopardized and the public health and safety is preserved; and (3) a furlough of state employees will reduce current spending and immediately improve the state's ability to meet its obligations to pay for essential services so as not to jeopardize its

---

[3] California Constitution, article IV, section 10, subdivision (f) states: "(f)(1) If, following the enactment of the budget bill for the 2004–05 fiscal year or any subsequent fiscal year, the Governor determines that, for that fiscal year, General Fund revenues will decline substantially below the estimate of General Fund revenues upon which the budget bill for that fiscal year, as enacted, was based, or General Fund expenditures will increase substantially above that estimate of General Fund revenues, or both, the Governor may issue a proclamation declaring a fiscal emergency and shall thereupon cause the Legislature to assemble in special session for this purpose. The proclamation shall identify the nature of the fiscal emergency and shall be submitted by the Governor to the Legislature, accompanied by proposed legislation to address the fiscal emergency. [¶] (2) If the Legislature fails to pass and send to the Governor a bill or bills to address the fiscal emergency by the 45th day following the issuance of the proclamation, the Legislature may not act on any other bill, nor may the Legislature adjourn for a joint recess, until that bill or those bills have been passed and sent to the Governor. [¶] (3) A bill addressing the fiscal emergency declared pursuant to this section shall contain a statement to that effect."

residents' health and safety. Accordingly, the Governor, "by virtue of the power and authority vested in [him] by the Constitution and statutes of the State of California, . . . determine[d] that an emergency pursuant to Government Code section 3516.5 exists" and issued an order that "the Department of Personnel Administration shall adopt a plan to implement a furlough of represented state employees and supervisors for two days per month, regardless of funding source." The Governor directed a similar furlough for all state managers and exempt employees. He also ordered the department to "work with all State agencies and departments to initiate layoffs and other position reduction and efficiency measures to achieve a reduction in General Fund payroll of up to ten percent."

The Legislature remained in session until it passed a budget, which was approved by the Governor. The budget provides in pertinent part: "Notwithstanding any other provision of this act, each item of appropriation in this act, . . . shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to other funds. . . . The Director of Finance shall allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section."

The Controller, whose office is responsible for processing payroll transactions for state employees, refused to comply with the furlough order with respect to the officers' employees. Accordingly, the Governor filed a petition for writ of mandate to compel the Controller to perform his ministerial duty.

The remaining officers filed a complaint in intervention, seeking a declaration that the Governor lacked the authority to furlough their employees. The trial court ruled in the Governor's favor, holding that the Governor had the statutory authority to furlough represented and unrepresented state employees under sections 19849[4] and 19851,[5] and the parties' memorandum of understandings (MOU's). This ruling applied to the officers' employees, as the

---

[4] Section 19849 provides as follows: "(a) The department shall adopt rules governing hours of work and overtime compensation and the keeping of records related thereto, including time and attendance records. Each appointing power shall administer and enforce such rules. [¶] (b) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if such provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

[5] Section 19851 provides as follows: "(a) It is the policy of the state that the workweek of the state employee shall be 40 hours, and the workday of state employees eight hours, except

Governor's authority extended to all civil service employees employed by civil executive officers. This power did not impermissibly interfere with the powers and duties assigned to each officer. In addition, the court was not persuaded by the officers' claims that the language of the furlough order did not include their employees, that the Governor was estopped from applying the order to their employees, and that the order was moot.[6] This appeal followed.

## DISCUSSION

### I

### *The Supreme Court Decision in* Professional Engineers

Because our Supreme Court's recent decision in *Professional Engineers, supra,* 50 Cal.4th 989 informs our decision here, we begin with a detailed discussion of that decision. There, as we have already explained, shortly after the Governor issued the furlough order, several employee organizations filed three separate lawsuits challenging the validity of the order and also filed separate writ petitions seeking to restrain implementation of the order. (*Id.* at p. 1003.) The trial court considered the matter on an expedited basis, conducted a single hearing in all three cases, and issued a single ruling denying the petitions and directing the Controller to comply with the furlough order. (*Id.* at pp. 1004, 1009.)

The plaintiff employee organizations appealed to this court, and ultimately the matter was transferred to the California Supreme Court for resolution of

---

that workweeks and workdays of a different number of hours may be established in order to meet the varying needs of the different state agencies. It is the policy of the state to avoid the necessity for overtime work whenever possible. This policy does not restrict the extension of regular working-hour schedules on an overtime basis in those activities and agencies where it is necessary to carry on the state business properly during a manpower shortage. [¶] (b) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if the provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

[6] Thereafter, on July 1, 2009, the Governor issued another executive order furloughing state employees for three days per month, beginning July 1, 2009, and continuing through June 30, 2010. On July 28, 2010, the Governor issued a new executive order furloughing state employees for three days per month, beginning August 1, 2010, and continuing until " 'a 2010–11 fiscal year budget is in place and the Director of the Department of Finance determines that there is sufficient cash to allow the State to meet its obligations to pay for critical and essential services to protect public health and safety and to meet its payment obligations protected by the California Constitution and federal law.' " (*Professional Engineers, supra,* 50 Cal.4th at p. 1008.) The present litigation does not involve the validity of the third furlough day that was in effect from July 1, 2009, to June 30, 2010, nor the validity of the Governor's July 28, 2010, furlough order.

the following issues: "First, on December 19, 2008, did the Governor possess authority to impose unilaterally a mandatory two-day-a-month unpaid furlough for state employees by issuing an executive order? Second, did the Legislature's enactment in February 2009 of the revised 2008 Budget Act and the initial 2009 Budget Act affect the validity of the Governor's executive order or the remedy that the employee organizations may be entitled to obtain in the present proceeding?" (*Professional Engineers, supra*, 50 Cal.4th at pp. 1012, 1009–1010.)

Turning to the first of these issues, our Supreme Court held that "unless the Governor or the [department] had been granted the authority unilaterally to impose a mandatory unpaid furlough on affected represented employees by the terms of an applicable MOU, the Governor and the [department] lacked authority unilaterally to institute such a furlough through the December 19, 2008, executive order with respect to those employees." (*Professional Engineers, supra*, 50 Cal.4th at p. 1039.)

■ In reaching this conclusion, the court rejected the Governor's argument that "the power to furlough state employees in the face of a fiscal emergency is an inherent part of his constitutional authority as the state's chief executive" under article V, section 1 of the California Constitution, noting that the Legislature, not the Governor, "generally possesses the ultimate authority to establish or revise the terms and conditions of state employment through legislative enactments," and "any authority that the Governor or an executive branch entity (such as the [department]) is entitled to exercise in this area emanates from the Legislature's delegation of a portion of its legislative authority to such executive officials or entities through statutory enactments." (*Professional Engineers, supra*, 50 Cal.4th at p. 1015, citing *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181–196 [172 Cal.Rptr. 487, 624 P.2d 1215], *State Trial Attorneys' Assn. v. State of California* (1976) 63 Cal.App.3d 298, 303 [133 Cal.Rptr. 712] and *Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 31–42 [30 Cal.Rptr.3d 30, 113 P.3d 1062].)

The court also rejected the Governor's argument, adopted by the trial court, that sections 19849 and 19851 gave the Governor the statutory authority unilaterally to furlough state employees. As the court explained, section 19851, subdivision (a), which provides for a 40-hour workweek and an eight-hour workday for state employees with an exception that workweeks and workdays of a different number of hours may be established in order to meet the varying needs of the different state agencies, "simply is not relevant" to the unpaid furlough program established through the Governor's

executive order. (*Professional Engineers, supra*, 50 Cal.4th at p. 1025.) This is so because the furlough program "does not establish different hours 'to meet the varying needs of the different state agencies,' but rather imposes an *across-the-board* rule that applies to virtually all executive branch agencies, regardless of their varying needs." (*Ibid.*)

Moreover, the furlough program "has no effect on the 'workweek' as that term is employed in section 19851" because "the principal purpose served by the designation of a normal 'workweek' . . . is to establish the number of hours that an employee may be required to work in a given week before the employee is entitled to receive overtime compensation for additional hours worked during that week," and the furlough program does not purport to alter the number of hours an employee is required to work before becoming eligible for overtime compensation. (*Professional Engineers, supra*, 50 Cal.4th at pp. 1026, 1028.) Because "[n]othing in section 19851, subdivision (a) purports to provide the Governor or the [department] with the authority to impose a unilateral across-the-board reduction of state employees' wages or earnings," the trial court erred in ruling that this provision authorized the Governor's furlough program. (*Professional Engineers*, at p. 1030.)

The court also rejected the trial court's reliance on section 19849, subdivision (a). This provision provides that the department " 'shall adopt rules governing hours of work and overtime compensation and the keeping of records related thereto, including time and attendance records,' " and that " '[e]ach appointing power shall administer and enforce such rules.' " (*Professional Engineers, supra*, 50 Cal.4th at p. 1031.) The court explained: "The trial court, having concluded that section 19851, subdivision (a) provided the substantive authority for the Governor and the [department] to reduce the hours state employees would be permitted to work, determined that the Governor's December 19, 2008, executive order directing the [department] to implement the furlough program constituted a 'rule' within the meaning of section 19849, subdivision (a) and thus was a permissible means of instituting the program. [¶] Because we have concluded that section 19851 does not authorize the Governor or the [department] to institute the challenged furlough program, section 19849 clearly does not independently provide the Governor or the [department] with such authority." (*Professional Engineers*, at p. 1031.)

The court further rejected the Governor's reliance on section 3516.5, which "simply provides that, as a general matter, when state employees are

represented by a recognized employee organization, the employer is required to provide the organization with notification and an opportunity to meet and confer before the employer implements any law, rule, resolution, or regulation directly relating to matters within the scope of representation," and also provides that "[t]he employer, [in cases of emergency], may implement the proposed action without first notifying the employee organization and giving it an opportunity to meet and confer on the matter, but still must notify and meet and confer with the organization regarding the action as soon as practical." (*Professional Engineers, supra*, 50 Cal.4th at pp. 1031–1032.) The court explained that section 3516.5 does not purport to provide "a source of authority for a state employer to take any particular type of substantive action in either a nonemergency or emergency situation," but instead "simply provides that when an employer possesses the authority *from some other source* to take a particular type of action relating to matters within the scope of representation, the employer ordinarily must notify and meet and confer with the employee organization before taking such action, but in an emergency may take the action and thereafter notify and meet and confer with the organization as soon as practical." (*Professional Engineers*, at pp. 1032–1033.) Thus, section 3516.5 does not provide the Governor with statutory authority to institute the mandatory unpaid furlough program.

■ The court then explained that no other statutory provision explicitly authorizes the Governor or the department unilaterally to reduce state employees' hours and wages due to a lack of funds. However, because "the principal effect of an involuntary unpaid furlough on state employees is the reduction in the employees' salaries or earnings," the court turned to section 19826, "the statutory provision governing the [department]'s authority to establish and adjust state employee salaries." (*Professional Engineers, supra*, 50 Cal.4th at p. 1036.) Subdivision (a) of this provision requires the department to consider certain factors in establishing and adjusting the salaries of nonrepresented employees, while subdivision (b) provides that the department shall *not* establish or adjust the salaries of represented employees through the process applicable to nonrepresented employees. Instead, the establishment and adjustment of represented employees' salaries is to be determined through the collective bargaining process established by the Ralph C. Dills Act (§ 3512 et seq.; hereafter the Dills Act). (*Professional Engineers*, at p. 1036.)

Turning to the Dills Act, the court explained that under section 3517.6, the terms and conditions embodied in an MOU supersede most of the general statutory provisions that govern the terms and conditions of state employment in the absence of an MOU, including sections 19851, 19849 and 19826. (*Professional Engineers, supra*, 50 Cal.4th at p. 1040.) And under section 3517.8, subdivision (a), " '[i]f [an MOU] has expired, and the Governor and the recognized employee organization have not agreed to a new [MOU] and

have not reached an impasse in negotiations, . . . the parties to the agreement shall continue to give effect to the provisions of the expired [MOU] . . . .' " (*Professional Engineers*, at p. 1039.)

On December 19, 2008, when the Governor issued his furlough order, "the terms and conditions of employment of the state employees represented by each of the plaintiff employee organizations were governed by an applicable MOU," and "[a]lthough each of the MOU's had expired, under section 3517.8 the terms of the expired MOU remained in effect, because the parties had not reached an impasse in their negotiations over a new MOU." (*Professional Engineers, supra*, 50 Cal.4th at p. 1040.) Thus, whether the Governor possessed the authority on December 19, 2008, unilaterally to impose a mandatory furlough on represented state employees depended upon the terms of the applicable MOU's, rather than general statutory provisions, and unless the MOU's authorized the furloughs, "it would appear that *at that time* the executive order was not valid." (*Id.* at pp. 1043, 1040–1041.)

The court did not, however, decide whether the trial court erred in finding that the applicable MOU's authorized the Governor's furlough order. Instead, the court concluded that the Legislature's enactment in February 2009 of the revised 2008 Budget Act, which "explicitly reduced the 2008–2009 fiscal year appropriation for state employee compensation to a level reflecting the reduced compensation to be paid to employees under the Governor's furlough plan," operated as a "legislative endorsement" of the furlough order. (*Professional Engineers, supra*, 50 Cal.4th at pp. 1043–1044.)

The revised 2008 Budget Act (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2) includes section 3.90,[7] which provides: " '(a) Notwithstanding any other provision of this act, each item of appropriation in this act, with the exception of those items for the California State University, the University of California, Hastings College of the Law, the Legislature (including the Legislative Counsel Bureau), and the judicial branch, shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amount of $385,762,000 from General Fund items and $285,196,000 from items relating to the other funds. It is the intent of the Legislature that General Fund savings of $1,024,326,000 and other fund savings of $688,375,000 in the 2009–10 fiscal year shall be achieved in the same manner described above. The Director of Finance shall

---

[7] There is a section 3.90 in both the revised 2008 Budget Act (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2, § 36) and the original 2009 Budget Act (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 1, § 3.90). Hereafter, we will refer to these sections as, simply, section 3.90.

allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section. [¶] (b) The [department] shall transmit proposed [MOU's] to the Legislature promptly and shall include with each such transmission estimated savings pursuant to this section of each agreement. [¶] (c) Nothing in this section shall change or supersede the provisions of the [Dills Act].' " (*Professional Engineers, supra,* 50 Cal.4th at p. 1044.)

The court interpreted the first clause of section 3.90 of the revised 2008 Budget Act to mean that reductions in employee compensation for represented employees shall be achieved either: (1) " 'through the collective bargaining process' "; or (2) " 'through existing administration authority,' " and that " 'a proportionate reduction for nonrepresented employees' " shall be achieved by " 'utilizing existing authority of the administration to adjust compensation for nonrepresented employees.' " (*Professional Engineers, supra,* 50 Cal.4th at p. 1045.) The court interpreted the phrase " 'existing administration authority' " to mean that the Legislature intended "to permit the mandated reductions in employee compensation to be achieved through the then existing furlough plan." (*Id.* at pp. 1045–1046.) The court explained: "Because, at the time the February 2009 budget legislation was enacted, the two-day-a-month furlough plan already was in existence, having been proposed and put in place—that is, authorized—by the existing gubernatorial administration, the furlough plan reasonably could be described as a means to achieve the mandated reduction in employee compensation through 'existing administration authority.' " (*Id.* at p. 1046.) The court further explained that this conclusion was fully supported by the legislative history, which repeatedly mentions that the revision to the 2008 Budget Act " 'reflects reductions across all budget areas to reduce employee compensation costs *related to furloughs,* the elimination of two state holidays, and minor changes to overtime calculations.' " (*Professional Engineers,* at p. 1046.)

■ The court concluded that, because the phrase " 'existing administration authority' " was intended to encompass the then existing furlough program, "[b]y enacting this provision, the Legislature, *through the exercise of its own legislative prerogative,* authorized the substantial reduction in the appropriations for employee compensation, mandated in the revised budget legislation, to be achieved through the two-day-a-month furlough plan." (*Professional Engineers, supra,* 50 Cal.4th at pp. 1047–1048.) Thus, while the court disagreed with the trial court's conclusion that sections 19849 and 19851 provided the Governor with authority unilaterally to furlough state workers, it nevertheless held that the plaintiff employee organizations were not entitled to a writ restraining implementation of the furlough order. (50 Cal.4th at p. 1052.)

II

*Supplemental Briefing*

Following the Supreme Court's decision in *Professional Engineers*, we asked the parties to address this decision in supplemental briefs. Specifically, we asked (1) whether the decision rendered this appeal moot; (2) whether the decision required us to reject certain arguments made by both sides; and (3) whether the decision offered guidance as to any remaining issues.

The parties agree, as do we, that *Professional Engineers* does not render this appeal moot. However, the Controller asserts that subsequent events, i.e., the fact that the officers are "now well into the 2010–2011 budget year," have rendered the appeal moot. While we agree that the issues raised by this appeal are technically moot, we exercise our inherent discretion to resolve them. There can be little doubt that this appeal raises issues of broad public interest that are likely to recur given the fact that our state's fiscal crisis is far from over. (See *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 172 [126 Cal.Rptr.2d 727, 56 P.3d 1029]; *Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 460 [111 Cal.Rptr.3d 822].)

The parties also agree that *Professional Engineers* "serves to reframe the issues that have been presented." The decision requires us to reject the Controller's argument that the Governor's furlough order usurped the power of the Legislature. As explained above, the Legislature effectively endorsed the Governor's furlough plan when it revised the 2008 Budget Act to authorize the mandated reduction in appropriations for employee compensation to be achieved through the two-day-a-month furlough plan.[8] (*Professional*

---

[8] The Controller also argues in supplemental briefing that section 3.90 of the revised 2008 Budget Act could not extend the Governor's furlough authority to the officers' employees without violating the single subject rule. As the Controller correctly observes, a budget bill may deal only with the subject of appropriations and may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess or to substantively amend and change existing statutory law. (*Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1198–1199 [219 Cal.Rptr. 664].) *Professional Engineers* disposes of this contention as well, holding that section 3.90 "does not substantively amend or change any existing statutory provision or expand or restrict the substantive authority of any state agency, and cannot reasonably be described as a substantive policy change 'masquerading as [a] Budget Act provision[].' [Citation.]" (*Professional Engineers, supra,* 50 Cal.4th at pp. 1049–1050.) The court explained: "In particular, section 3.90 of the revised 2008 Budget Act does not alter the provisions of Government Code section 19826 or purport to grant the Governor or the [department] authority to impose unpaid furloughs *unilaterally,* but rather embodies the Legislature's determination that the two-day-a-month furlough plan is a permissible means by which the specific reductions set forth in section 3.90 may be implemented. Section 19826 places no limitation upon *the Legislature's authority* to increase or reduce the pay or salaries of state employees, and section 3.90 simply represents an exercise of the

*Engineers, supra,* 50 Cal.4th at p. 1044.) The decision also requires us to reject the Governor's argument that sections 19849 and 19851 provide him with the authority unilaterally to furlough state workers. These provisions do no such thing. (*Professional Engineers,* at pp. 1024–1031.)

However, the following questions remain: First, did the furlough order apply to the officers' employees, such that the Controller had a ministerial duty to implement the mandatory furlough plan as to these employees? Second, if the Controller had such a duty, did this duty cease when the Legislature subsequently passed a budget and the Governor used the line-item veto to cut the officers' respective budgets because the officers refused to implement the furloughs? Third, do principles of equitable estoppel operate to prevent the Governor from enforcing the furlough order against the officers? And finally, would applying the furlough order to the officers violate the California Constitution's system of divided executive authority and impermissibly interfere with their statutory right to control the staffing and management of their respective offices? We turn to these questions now.

### III

#### *Does the Furlough Plan Apply to Officers' Employees*

After describing the fiscal emergency facing California, Executive Order No. S-16-08 (Dec. 19, 2008) ordered "that effective February 1, 2009 through June 30, 2010, the [department] shall adopt a plan to implement a furlough of represented state employees and supervisors for two days per month, regardless of funding source. This plan shall include a limited exemption process." The Governor further ordered the department to "implement an equivalent furlough or salary reduction for all state managers, including exempt state employees, regardless of funding source." It was further ordered that the department "shall work with all State agencies and departments to initiate layoffs and other position reduction and program efficiency measures to achieve a reduction in General Fund payroll of up to ten percent" with "[a] limited exemption process." The Governor further ordered the department to "place the least senior twenty percent of state employees funded in any amount by General Fund resources on the State Restriction of Appointment (SROA) list." It was further ordered that "all State agencies and departments

---

Legislature's reserved authority over state-employee compensation." (*Professional Engineers,* at pp. 1050–1051, fn. omitted.) And while the Controller argues that the single subject rule "prevented the Legislature from both ratifying the Governor's furlough program and authorizing the Governor to impose that program on the officers," we hold in the remaining portions of this opinion that the furlough plan that was approved by the Legislature applied to the officers' employees, and therefore section 3.90 served as an exercise of *the Legislature's* reserved authority over the compensation of these employees. The single subject rule was not violated.

under [the Governor's] direct executive authority, regardless of funding source, are prohibited from entering into any new personal services or consulting contracts to perform work as a result of the furloughs, layoffs or other position reduction measures implemented as a result of this Order." Finally, the furlough order requested "that other entities of the State government not under [the Governor's] direct executive authority, including the California Public Utilities Commission, the University of California, the California State University, California Community Colleges, the legislative branch (including the Legislative Counsel Bureau), and the judicial branch, implement similar or other mitigation measures to achieve budget and cash savings for the current and next fiscal year."

The Controller asserts that this order cannot reasonably be construed to apply to the officers' employees. The trial court disagreed, finding that the officers are "civil executive officers" under section 1001, and that their employees are therefore " 'subject to the jurisdiction of the State Personnel Board with respect to the merit aspects of their employment and to the [department] with respect to the nonmerit aspects of employment.' " (See *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1225 [70 Cal.Rptr.2d 745]; see also *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1322–1323, fn. 8 [26 Cal.Rptr.2d 666].)[9] Because "nonmerit aspects of the state's personnel system extend generally to the state's financial relationship with its employees, and embrace such matters as salary, layoffs and nondisciplinary demotions," the trial court concluded that the Governor's authority to furlough state employees extended to the officers' employees.

---

[9] Section 1001 provides: "The civil executive officers are: a Governor; a private secretary and an executive secretary for the Governor; a Lieutenant Governor; a Secretary of State; a Deputy Secretary of State; a Keeper of Archives of State for Secretary of State; a bookkeeper for the Secretary of State; three recording clerks for the Secretary of State; a Controller; a Deputy Controller; a bookkeeper for the Controller; five clerks for the Controller; a Treasurer; a Deputy Treasurer; a bookkeeper for the Treasurer; a clerk for six months in each year for the Treasurer; an Attorney General and all assistant and deputy attorneys general; a Superintendent of Public Instruction; one clerk for the Superintendent of Public Instruction; an Insurance Commissioner; a deputy for the Insurance Commissioner; four port wardens for the Port of San Francisco; a port warden for each port of entry except San Francisco; five State Harbor Commissioners for San Francisco Harbor; six pilots for each harbor where there is no board of pilot commissioners; three members of the Board of Pilot Commissioners for Humboldt Bay and Bar; 13 members of the State Board of Agriculture; four members of the State Board of Equalization; a clerk of the Board of Equalization; three members of the State Board of Education; a librarian for the Supreme Court Library and the chief deputy clerk and the deputy clerks of the Supreme Court; five directors for the insane asylum at Stockton; five directors for the insane asylum at Napa; the manager, assistant manager, chief counsel and division chiefs, State Compensation Insurance Fund; the head of each department and all chiefs of divisions, deputies and secretaries of a department; such other officers as fill offices created by or under the authority of charters or laws for the government of counties and cities or of the health, school, election, road, or revenue laws."

While we disagree, as we must, with the trial court's conclusion that the Governor possessed the authority unilaterally to furlough state workers pursuant to sections 19849 and 19851 (see *Professional Engineers, supra,* 50 Cal.4th at pp. 1024–1031), we agree that the furlough order, as subsequently endorsed and validated by the Legislature, applied to the officers' employees, and that the Controller therefore possessed a ministerial duty to implement the order as to these employees.

■ "The construction of an executive order presents an issue akin to an issue of statutory interpretation—one that presumably presents a question of law for our independent review on appeal. [Citations.]" (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 877 [13 Cal.Rptr.3d 420].) Accordingly, we must read the words of the furlough order to determine its purpose, seeking to "interpret it in a manner that promotes wise policy, not absurdity. We avoid an interpretation that would render terms surplusage, but seek to give every word some significance, leaving no part useless or devoid of meaning. [Citations.]" (*Ibid.*) And where the language of the executive order is clear and unambiguous, we must follow its plain meaning. (*Id.* at p. 878.)

The Controller makes much of the fact that the furlough order does not specifically direct a furlough of the officers' employees. But the order does specifically direct the department to "adopt a plan to implement a furlough of represented state employees and supervisors for two days per month, regardless of funding source," and to "implement an equivalent furlough or salary reduction for all state managers, including exempt state employees, regardless of funding source." So the question becomes: do the officers employ "represented state employees and supervisors" or "state managers, including exempt state employees"? If so, the furlough order applied to them, unless, of course, some other part of the order excluded them from coverage.

■ Under section 1001, the Governor, the Lieutenant Governor, the Secretary of State, the Treasurer, the Attorney General, the Controller, the Insurance Commissioner, the Superintendent of Public Instruction, and the members of the Board of Equalization are "civil executive officers." Article VII, section 1, subdivision (a) of the California Constitution defines the "civil service" to include "every officer and employee of the State except as otherwise provided in this Constitution." As relevant to this appeal, section 4 of this article exempts from the civil service "[o]fficers elected by the people and a deputy and an employee selected by each elected officer" (Cal. Const., art. VII, § 4, subd. (c)), "[m]embers of boards and commissions" (Cal. Const., art. VII, § 4, subd. (d)), "[a] deputy or employee selected by each board or commission either appointed by the Governor or authorized by statute" (Cal. Const., art. VII, § 4, subd. (e)), "the employees of the Lieutenant Governor's office directly appointed or employed by the Lieutenant Governor" (Cal. Const., art. VII, § 4, subd. (f)),

"[a] deputy or employee selected by each officer, except members of boards and commissions, exempted under Section 4(f)" (Cal. Const., art. VII, § 4, subd. (g)), "[t]he teaching staff of schools under the jurisdiction of the Department of Education or the Superintendent of Public Instruction" (Cal. Const., art. VII, § 4, subd. (i)), and "six deputies or employees" appointed or employed by the Attorney General (Cal. Const., art. VII, § 4, subd. (m)). (See also §§ 12101, 12152, 12302, 12402, 12502.)[10]

 Thus, while certain members of the officers' respective staffs are exempt from the civil service system pursuant to article VII, section 4 of the California Constitution, all other employees "are subject to the civil service

---

[10] With respect to the Lieutenant Governor, section 12101 provides: "The Lieutenant Governor may appoint and, subject to the approval of the Director of Finance, fix the salaries of one secretary and such clerical assistants as the Lieutenant Governor deems necessary for his office."

With respect to the Secretary of State, section 12152 provides: "(a) To assist him or her in the discharge of the duties of his or her office, the Secretary of State may appoint one Assistant Secretary of State, whose powers, duties and liabilities shall be those of a deputy, and any deputies and clerical, expert, technical and other assistants necessary for the proper conduct of his or her office. The Assistant Secretary of State and all deputies are civil executive officers. [¶] (b) Notwithstanding any other provision of law, but consistent with Section 4 of Article VII of the California Constitution and with subdivision (a) of this section, the Governor shall appoint four employees of the Secretary of State's office, who may be nominated by the Secretary of State, and who are exempt from state civil service."

With respect to the Treasurer, section 12302 provides: "The Treasurer may appoint one deputy treasurer at the annual salary as the Treasurer shall establish. The Treasurer may also designate and appoint, or terminate the designation and appointment of, any officer or employee of his or her office, in addition to the deputy treasurer, to have the powers and liabilities of a deputy. The appointment or termination of appointment shall be effective upon signing by the Treasurer. The Treasurer may also appoint and fix the salaries, subject to the State Civil Service Act (Part 2 (commencing with Section 18500) of Division 5), of such officers and employees as may be necessary to carry out the duties of the office. The Treasurer may appoint as civil executive officers: one cashier, one bond officer, one deposit officer, one vault officer, one principal accountant, one bookkeeper, and one secretary-stenographer."

With respect to the Controller, section 12402 provides: "The Controller may organize his or her office into divisions and may, in conformity with the State Civil Service Act (Part 2 (commencing with Section 18500) of Division 5) and the State Constitution, appoint deputy controllers, chiefs of divisions, and other subordinate officers and employees as may be necessary for the proper conduct of the office. In addition to deputy controllers that may hold title and office pursuant to the power of appointment vested in the Controller by Section 4 of Article VII of the State Constitution or pursuant to appointment of an established classification in the state civil service, the Controller may designate and appoint, or terminate the designation and appointment of, any officers or employees of his or her office having status in other classifications in the state civil service, to act as deputy controllers while performing the duties of their established classifications. Appointments and terminations of appointments made pursuant to this section shall be effective when signed by the Controller."

With respect to the Attorney General, section 12502 provides: "The Attorney General may appoint and fix the salaries of such Assistant Attorneys General, Deputy Attorneys General, service agents, experts, and technical and clerical employees as he deems necessary for the proper performance of the duties of his office. Each appointee is a civil executive officer."

system of employment" and "are thus subject to the jurisdiction of the State Personnel Board with respect to the merit aspects of their employment and to the [department] with respect to the nonmerit aspects of employment." (*Schabarum v. California Legislature, supra,* 60 Cal.App.4th at p. 1225; see *Tirapelle v. Davis, supra,* 20 Cal.App.4th at pp. 1322–1323, fn. 8.) Moreover, it is undisputed that the vast majority of the officers' employees are "represented" by employee organizations that were petitioners in *Professional Engineers, supra,* 50 Cal.4th 989. As of December 2008, there were roughly 15,000 state employees on the officers' staffs. Approximately 11,096 of these employees were represented by employee organizations that were petitioners in *Professional Engineers.* Accordingly, these employees are "represented state employees" within the meaning of the furlough order regardless of whether they work for the Governor, the Controller, the Treasurer, or any other officer elected by the people.

Nevertheless, the Controller asserts that the furlough order did not apply to the officers' employees because, after the Governor ordered the furlough of "represented state employees," he *requested* "that other entities of the State government *not under [his] direct executive authority,* including the California Public Utilities Commission, the University of California, the California State University, California Community Colleges, the legislative branch (including the Legislative Counsel Bureau), and the judicial branch, implement similar or other mitigation measures to achieve budget and cash savings for the current and next fiscal year." (Italics added.) Because, argues the Controller, "[t]he Governor has repeatedly recognized that the constitutional officers are not subordinate officers under his direct executive authority," and because the word "including" is " 'ordinarily a term of enlargement rather than limitation,' " the officers, while not specifically named, were included in the provision requesting implementation of similar or other mitigation measures, and were therefore excluded from the provision ordering the furlough of represented state employees. We are not persuaded. The fact that the Governor requested entities not under his direct executive authority to implement similar measures to achieve budget and cash savings does not change the plain and unambiguous meaning of the phrase "represented state employees."

Simply put, the furlough order directed the furlough of "represented state employees." The officers collectively employ over 11,000 such employees. Thus, the furlough order applied to the officers' employees, and because the Legislature endorsed the Governor's furlough plan, the Controller possessed a ministerial duty to comply with the order as to these employees.

## IV

### *Subsequent Passages of a Budget*

We are not persuaded by the Controller's argument that his duty to implement the furlough order with respect to the officers' employees ceased when the Legislature subsequently passed a budget and the Governor used the line-item veto to cut the officers' respective budgets.

As the trial court explained, "the evidence submitted by the Governor demonstrates that furloughs for state employees, including the employees of the [officers], explicitly were factored into the fiscal assumptions underlying the [revised] Budget Act of 2008." As Diana L. Ducay, program manager for the administration unit of California's Department of Finance, explained in her declaration: "Section 3.90 of the Budget Act of 2008 requires that overall budget appropriations for fiscal year 2008–2009 be reduced in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to other funds to reflect reductions in state employee compensation for that fiscal year. [¶] Section 3.90 . . . mandates that budget appropriations for fiscal year 2009–2010 be reduced in the total amounts of $1,024,326,000 from General Fund items and $688,375,000 from items relating to other funds to reflect reductions in state employee compensation for that fiscal year."

Ducay continued: "These budget reduction figures legislatively mandated by both sections 3.90 for fiscal years 2008–2009 and 2009–2010 were calculated by the Administration Unit of the Department of Finance, which I manage, in cooperation with the [department], prior to those figures being included in the legislation. Our calculation of these figures was based, in part, on the assumption that all state employees, including those who work in the offices of the civil executive officers of the State, i.e., the Lieutenant Governor, the Secretary of State, the Treasurer, the Attorney General, the Controller, the Superintendent of Public Instruction, the Insurance Commissioner, and the Board of Equalization, would be furloughed two days a month from February 2009 to June 2010 as required by [the furlough order]. Thus, the assumptions underlying the required budget savings specified in section 3.90 for fiscal years 2008–2009 and 2009–2010 include two-day a month furloughs for the employees of the civil executive officers."

As already indicated, our Supreme Court has held that by adding section 3.90 to the Budget Act of 2008, "the Legislature, *through the exercise of its own legislative prerogative*, authorized the substantial reduction in the appropriations for employee compensation, mandated in the revised budget legislation, to be achieved through the two-day-a-month furlough plan."

(*Professional Engineers, supra*, 50 Cal.4th at pp. 1047–1048.) The same provision was included in the Budget Act of 2009. Substantial evidence supports the trial court's conclusion that the reductions specified in section 3.90 for each fiscal year assumed that the officers' employees would also be furloughed. Thus, far from rendering the furlough order moot, the subsequent budget legislation endorsed the Governor's furlough plan, which included the furlough of the officers' employees. In other words, even if the Controller is correct that the Governor did not possess the power unilaterally to furlough the officers' employees and that no ministerial duty on the Controller's part arose from the furlough order itself, such a duty certainly arose from the Legislature's subsequent ratification of the furlough plan.

Nevertheless, the Controller asserts that the Governor's furlough order, as it related to the officers' employees, was rendered moot by his subsequent line-item vetoes, which cut more from the officers' budgets than the projected savings from the furlough plan. Specifically, the Controller argues: "In his veto statement, the Governor directly linked cutbacks in the personal services budgets of [the Attorney General, the Controller, the Secretary of State, and the Department of Education] to the reductions that would have accrued from his two-day per month furlough program and other compensation reduction measures." "For each of these officers," argues the Controller, "the reduction amounted to an estimated 10 percent of that officer's annual personal services budget," and "[i]n each case, the Governor stated that the veto 'reflects the state employee compensation reductions for furloughs, overtime reform, and elimination of two state holidays.' " The Controller also points out that the Governor "directly linked his cutbacks in the Legislature's appropriations for the Board of Equalization and the State Treasurer to the furloughs," and "frankly acknowledged that he took this action '[b]ecause [each] has declined to participate in the furloughs.' " With respect to each of these cuts, the Governor stated that the purpose was to " 'ensure equity among all executive branch agencies relative to employee compensation levels.' " Finally, the Controller asserts: "The Governor cut a greater percentage from the Lieutenant Governor's 2009–2010 budget than he cut from any of the other officers' budgets," and while "not expressly linked to furloughs, this veto, given its magnitude, must be viewed as at least partially in lieu of the furloughs as well."

The trial court disagreed, ruling that these statements "do not demonstrate that the Governor intended the line item vetoes to substitute for furloughs. Instead, the line item vetoes simply represented additional budget cuts for the affected officers." We agree with the trial court. As we have already concluded, substantial evidence supports the trial court's conclusion that the reductions specified in section 3.90 for each fiscal year assumed that the officers' employees would be furloughed. Thus, regardless of whether the Governor stated that the vetoes "reflect[ed] the state employee compensation reductions

for furloughs, overtime reform, and elimination of two state holidays," these cuts were in addition to the savings envisioned by the furlough plan.

## V

### *Estoppel*

The Controller further asserts that principles of equitable estoppel operate to prevent the Governor from enforcing the furlough order against the officers. We disagree.

"The essence of an estoppel is that one has, by false statements or conduct, led another to do that which he would not otherwise have done and as a result the other has suffered injury. [Citation.] The elements of an estoppel claim are: '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' [Citation.] Where the defendant is a government entity, a fifth element requires that the injury to the plaintiff's personal interest if the government is not estopped outweighs the injury to the public interest if the government is estopped. [Citation.]" (*Golden Day Schools, Inc. v. Department of Education* (1999) 69 Cal.App.4th 681, 692–693 [81 Cal.Rptr.2d 758].) Moreover, simple reliance on a false statement or conduct is not enough. In order to invoke the doctrine of equitable estoppel, the reliance must be reasonable. (*Morrison v. California Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 218 [252 Cal.Rptr. 293].)

The trial court thoroughly summarized and appropriately rejected this argument in the following terms:

"The essence of [the Controller]'s claim of estoppel in this case is that the Governor intentionally misled them by telling them that the [furlough order] did not, and would not, apply to their employees. As support for this contention, [the Controller] ha[s] offered declarations made by representatives of various offices, all of which focus on a telephone conference call that took place on January 9, 2009 between the declarants and representatives of the [department], acting on behalf of the Governor. Although the declarations differ in the amount of detail they offer, and sometimes differ among themselves as to who said what, in substance they tell the same story. Accordingly, the following excerpt from the Declaration of Collin Wong-Martinusen, Chief Deputy State Controller/Chief of Staff, is illustrative:

" '4. On January 9, 2009, the [department] conducted a conference call with representatives of the various constitutional and state-wide elected officials. Ms. Debbie Endsley, Chief Deputy Director, [the department], participated in that conference call. I represented the State Controller on that telephone call. In response to a question as to the applicability of the order to the employees of the constitutional officers, Ms. Endsley stated that the [furlough] order did not apply but urged the voluntary compliance to the constitutional officers.'

"In response to these declarations, the Governor has submitted the Declaration of Debra L. Endsley, Chief Deputy Director of the [department], which tells a different story:

" '3. On January 9, 2009, I participated in a conference call with Paul Feist, Deputy Cabinet Secretary for the Governor. The conference call included representatives from the various State of California civil executive officers. The topic of the call was furloughing of state employees, including the employees in the offices of the civil executive officers.'

" '4. During the course of the telephone call, Mr. Feist explained that it was the Administration's understanding that the Governor could not legally furlough the employees of the civil executive officers. One of the participants in the telephone call, a representative from the Insurance Commissioner's office, questioned the legal interpretation that the furloughs did not apply to the civil executive officers. Following this question, I told the group that the [department] would have our legal office research the authority to furlough employees of constitutional offices and get this information to the Governor's Office. At the conclusion of the telephone call, the question of whether the furloughs applied to the employees of the civil executive officers, and the Governor's legal authority to furlough that group of employees, was definitely unresolved and the subject left open.'

"Based upon this evidence, and viewing it in the light most favorable to [the Controller], the Court finds that the doctrine of estoppel should not be applied here. In essence, [the Controller] contend[s] that, as of January 9, 2009, the Governor made a clear statement that he would not seek to apply the [furlough order] to their employees regardless of its terms and regardless of the circumstances. Even if this characterization of events were taken as true, the Court finds that such a representation was not one on which [the Controller] reasonably could rely[.] They acknowledge that the Governor was urging them to implement equivalent savings voluntarily, which indicates that they knew that they were not being exempt from the need to cut costs. At the same time, with the State's financial situation in January being extremely critical, and moreover, according to the State Controller's projections, worsening practically on a daily basis (as was amply documented by the evidence

submitted in the union writ cases), [the Controller] could not reasonably assume that their voluntary efforts would exempt them from the need to make further, deeper cuts later. In other words, even if the Governor initially stated that he would not apply the [furlough order] to their employees, [the Controller] could not reasonably assume that he might not adjust course later under the pressure of worsening fiscal conditions. Thus, the Court does not find that the budgetary savings these officers realized voluntarily should be seen as reasonably having been made in reliance on the Governor's statements regarding the [furlough order], since they would have been required to make the cuts in any event under the circumstances. Similarly, the Court does not find that such efforts precluded the Governor from adjusting his position regarding enforcement of the [furlough order], since it was not reasonable to assume that further cuts would by unnecessary."

We agree with the trial court's assessment of the situation. Moreover, whether reliance on a false statement or conduct is reasonable is a question of fact. Accordingly, even if we disagreed with the trial court's factual determination as to the reasonableness of the officers' reliance, we must defer to that determination "unless reasonable minds could reach only one conclusion based on the evidence." (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 187 [104 Cal.Rptr.3d 508].) We cannot hold that the only reasonable conclusion to draw from these facts is that the officers reasonably relied on the Governor's statement regarding the furlough order.

"When [the doctrine of equitable estoppel] is successfully invoked, the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair." (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 486 [81 Cal.Rptr.3d 72].) In addition to rejecting the Controller's estoppel argument based on the officers' unreasonable reliance on the Governor's statement regarding the furlough order, the trial court ruled that it would not be " 'intolerably unfair' to permit the [furlough order] to be applied to the employees of [the officers]. Notwithstanding the recent passage of the Budget Act, serious fiscal problems remain. All sides recognize that spending cuts may be one necessary part of an effective response to these problems. The Governor's decision to require the employees of the elected civil executive officials to make an additional contribution to that response through furloughs—even if, as argued, that decision was belated or represented a reversal of the Governor's original approach—is not intolerably unfair." We agree with this assessment as well.

The trial court did not abuse its discretion by declining to apply the doctrine of equitable estoppel to prevent the Governor from enforcing the furlough order against the officers' employees.

VI

*Divided Executive Authority*

Finally, we reject the Controller's argument that applying the furlough order to the officers violates the California Constitution's system of divided executive authority and impermissibly interferes with their statutory right to control the staffing and management of their respective offices.

It is true, as the Controller points out, that the California Constitution, unlike its federal counterpart, "embodies a structure of divided executive power, providing for the statewide election of not only the Governor (and the Lieutenant Governor), but also of the Attorney General, the State Treasurer, the Secretary of State, the Controller, and the Superintendent of Public Instruction." (*Marine Forests Society v. California Coastal Com., supra*, 36 Cal.4th at p. 31.) But it is equally true that, "unlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, . . . the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution." (*Ibid.*)

And while the California Constitution vests the "supreme executive power" of the state in the Governor (Cal. Const., art. V, § 1), it "follows a minimalist approach" with respect to the Controller and the other officers, "that is, it provides for the office but primarily leaves it to the Legislature to define the duties and functions" of the office. (*Tirapelle v. Davis, supra*, 20 Cal.App.4th at p. 1327.) The Constitution also provides that "[t]he Governor may require executive officers and agencies and their employees to furnish information relating to their duties." (Cal. Const., art. V, § 4.) Moreover, using its plenary legislative authority to define the relationship between the Governor and the officers, the Legislature has provided that "[t]he Governor shall supervise the official conduct of all executive and ministerial officers." (§ 12010.) The Legislature has further provided that "[t]he Governor shall see that all offices are filled and their duties performed. If default occurs, he shall apply such remedy as the law allows. If the remedy is imperfect, he shall so advise the Legislature at its next session." (§ 12011.)

Thus, while California's executive branch is divided in the sense that the officers are independently elected, and therefore cannot be removed by the Governor, the Governor is charged with supervising the official conduct of these officers.

However, relying on the early case of *McCauley v. Brooks* (1860) 16 Cal. 11, the Controller asserts that he and the other officers are "entirely independent" of the Governor. (*Id.* at p. 55.) That case involved the power of the

courts to order the Controller to issue certain warrants to a lessee who entered into a contract with the state pursuant to an 1856 statute that gave the lessee the right to demand and receive from the Controller warrants for the monthly payments named in the contract. (*Id.* at pp. 24–27.) After rejecting the Controller's arguments that his refusal to issue the warrants was justified (*id.* at pp. 28–38), our Supreme Court held that principles of separation of powers did not prevent the issuance of a writ of mandate compelling the Controller to issue the warrants (*id.* at pp. 39–47). The court explained: "There is nothing in [the California Constitution's separation of powers clause] which places either [the executive department or the legislative department] above the law, or makes either independent of the other. It simply provides that there shall be *separate* departments, and it is only in a restricted sense that they are independent of each other. There is no such thing as absolute independence. Where discretion is vested in terms, or necessarily implied from the nature of the duties to be performed, they are independent of each other, but in no other case." (*Id.* at p. 39.)

The court continued: "To the executive department a large and important class of duties is entrusted, in the performance of which its officers are subject to no control. The Governor, the head of that department, can recommend such measures as in his judgment will promote the public interest; he can approve or disapprove of such legislation as in his opinion may advance or injure the public welfare; he can exercise his discretion in numerous appointments to office; he can grant such reprieves and pardons for all offenses after conviction, except for treason and in cases of impeachment, as he may think proper, and call out the militia when he considers that proceeding necessary to suppress insurrection or repel invasion. The manner in which he shall exercise these duties rests in his sole discretion. In these matters he is independent of the other departments; but numerous other duties assigned to him arise from legislation in which he may never have participated, or in relation to which he possessed only a qualified negative, and in the performance of which duties he has no discretion, but is subject, like every other citizen, to the law." (*McCauley v. Brooks, supra,* 16 Cal. at p. 40.) Similarly, explained the court, "when duties are imposed upon [the Controller, or the Treasurer, or any other executive officer], in regard to which he has no discretion, and in the execution of which individuals have a direct pecuniary interest, and there is no other plain, speedy and adequate remedy, he can be required to perform those duties by the compulsory process of mandamus." (*Id.* at p. 41.)

In this case, the Controller relies heavily on statements made by the *McCauley* court following a petition for rehearing filed by the Attorney General in which the court elaborated on the ministerial nature of the Controller's duties and fashioned a hypothetical scenario demonstrating the practical consequences of the Attorney General's position that executive

officers cannot be compelled by the courts to exercise their ministerial duties. (*McCauley v. Brooks, supra,* 16 Cal. at pp. 55–59.) It was in this context that the court stated: "The Controller of the State is an officer of the executive department, but the greater part of the duties devolved upon him by the law are of a ministerial character. The Constitution does not define his duties. It only provides that there shall be such an officer, declares that he shall be subject to impeachment, the mode of his election, and that his compensation shall not be increased or diminished during his term of office. He does not hold his appointment of the Governor, is not responsible to him, and acts entirely independent of him. His duties are enumerated and defined by the law, and they are, as we have said, generally of a purely ministerial character." (*Id.* at p. 55.)

The Controller makes much of the "entirely independent" language. However, as the court was not called upon to decide whether the Controller acted independently of the Governor, *McCauley* cannot be considered authority for this proposition. (See *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399]; *LEG Investments v. Boxler* (2010) 183 Cal.App.4th 484, 497, fn. 5 [107 Cal.Rptr.3d 519] ["cases are not authority for propositions not considered and decided"].) Moreover, this statement must be considered in its larger context. As already indicated, in describing the separation of powers between the various branches of government, the court stated: "There is no such thing as absolute independence." (*McCauley v. Brooks, supra,* 16 Cal. at p. 39.) The same can be said of the separation between the Governor and the other independently elected executive officers. Furthermore, the court acknowledged that the Constitution left defining the functions and duties of the various executive offices to the Legislature. Instead of making these officers entirely independent of the Governor, the Legislature, in 1945, provided that the Governor shall supervise their official conduct. (§ 12010.) The Constitution was also amended in 1966 to allow the Governor to "require executive officers and agencies and their employees to furnish information relating to their duties." (Cal. Const., art. V, § 4.) Accordingly, even if the officers' actions were entirely independent of the Governor when *McCauley* was decided in 1860, such is no longer the case. Indeed, in certain situations, the Governor may specifically direct the actions of these officers. (See, e.g., § 12013 ["The Governor may direct the Attorney General to appear on behalf of the State and may employ such additional counsel as he deems expedient whenever any suit or legal proceeding is pending: [¶] (a) Against the State. [¶] (b) Which may affect the title of the State to any property. [¶] (c) Which may result in a claim against the State."].)

In any event, we need not resolve further the abstract question of the degree of independence each officer possesses with respect to the Governor. Nor must we decide whether the Governor, acting alone, possesses the

authority to furlough the employees of these officers. This is because the Legislature has endorsed the Governor's furlough plan. (*Professional Engineers, supra,* 50 Cal.4th at pp. 1047–1048.) As we have explained, the Legislature "possesses the ultimate authority to establish or revise the terms and conditions of state employment through legislative enactments." (*Id.* at p. 1015, citing *Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at pp. 181–196, *State Trial Attorneys' Assn. v. State of California, supra,* 63 Cal.App.3d at p. 303 and *Marine Forests Society v. California Coastal Com., supra,* 36 Cal.4th at pp. 31–42.) And the Controller acknowledges that the Legislature's authority in this regard extends to the officers' employees: "Like the Governor, the constitutional officers operate subject to the provisions of the state civil service system, the terms and conditions for state employment established by statute and regulation, and the memoranda of understanding between the state and the recognized employee bargaining units."

Finally, we also reject the Controller's argument that the furlough plan interferes with the officers' statutory right to control the staffing and management of their respective offices. The plan effectively reduces the salaries of furloughed employees. (*Professional Engineers, supra,* 50 Cal.4th at p. 1036.) But it does not interfere with the officers' statutory power to "appoint those employees the officer deems necessary to perform the duties of his or her office." In any event, by approving the furlough plan, the Legislature has also endorsed whatever impact the Governor's order might have on the functioning of the officers' respective offices.

## VII

### *Summary*

The Governor's furlough order, which was subsequently approved by the Legislature, applied to the officers' employees, such that the Controller had a ministerial duty to implement the mandatory furlough plan as to these employees. This duty did not cease when the Governor subsequently used the line-item veto to cut the officers' respective budgets because the officers refused to implement the furloughs. Nor do principles of equitable estoppel operate to prevent the Governor from enforcing the furlough order against the officers. Finally, applying the furlough order to the officers does not violate the California Constitution's system of divided executive authority or impermissibly interfere with their statutory right to control the staffing and management of their respective offices.

## DISPOSITION

The judgment granting the petition for writ of mandate is affirmed.

Raye, P. J., and Nicholson, J., concurred.